### CHARLES MURCH *versus* PEOL TOMER.

That the defendant was an Indian of the Penobscot tribe, furnishes no defence to an action upon a promissory note made by him.

The slightest imposition, however, in obtaining the note, would prevent a recovery upon it.

THE parties agreed, that the action was upon a note of hand signed by the defendant, and that he was at the time of signing it, and still is, an Indian of the Penobscot tribe. If the action could be maintained against the defendant, he being an Indian as aforesaid, he was to be defaulted; and if not, the plaintiff was to become nonsuit.

At the June Term, 1842, the case was continued *nisi* under an agreement, that it should be argued in writing. No arguments have come into the hands of the Reporter.

*J. Appleton* and *Randall,* for the plaintiff.

*Cony & Sewall,* for the defendant.

The opinion of the Court was drawn up by

WHITMAN C. J. — Tomer, it appears, is an Indian of the Penobscot tribe. The action against him is upon a note of hand; and it is contended that, by reason of his being such Indian, he is not liable upon it. But for certain enactments of the legislature, it would not, probably, have been doubted, that the defendant might have made a valid contract. He might not have been deemed a citizen, or as having any of the privileges incident to citizenship. His condition, however, in reference to his contracts, might not be distinguishable from that of a foreigner, who might be sojourning among us.

The aborigines of this country were its ancient proprietors. But, emigrants from Europe having obtained a foothold here,

and having increased in numbers, till their power had greatly transcended that of the natives, they at length assumed entire control over them ; till it has become settled law, that even the territory and soil of the small districts, to which they are now reduced, in their occupation, is not absolutely theirs in fee. They are prohibited from alienating ; and even the use and improvement of it is not left to their entire control. Our citizens, throughout the United States, have been prohibited, except under certain regulations, in some of them, from purchasing lands of the Indians. These regulations have been wise and politic, without doubt ; but they show the altered and humbled condition of the ancient possessors of the country.

In this State, by an act, ch. 175, § 1, passed in 1821, it was provided, that the Governor, by and with the consent of the Council, might appoint one or more, not exceeding three persons, to be agents for the Penobscot tribe of Indians. By § 4, of the same act, it was provided, that such agent or agents should have the care and management of their property for their use and benefit; and further, that all contracts and bargains, of every kind, relative to the sale or disposal of trees, timber or grass, growing or being on said Indians' land, and all leases and other contracts, relative to the improvement of lands, which any person may obtain from said Indians, shall be void and of no effect unless approved by such agent or agents. And by § 5 it was provided that such agent or agents, in his or their own names, might maintain any proper action for any sum due any Indian or Indians or their respective tribes ; or for any injury done to them or their property, for the benefit of such Indian or Indians or their tribes. Other regulations have since been made, from time to time, relative to the location, allotment and occupation of their lands. And all the provisions in the different acts were re-enacted in the Revised Statutes, excepting the one, that provides that agents shall have the care and management of the property of the Indians for their use and benefit. This provision, from the place of its former insertion, and the subject matter with which it was connected, may be believed to have been intended only in reference to the real

Murch v. Tomer.

estate of the Indians. It would seem that it never could have been contemplated to give such agents any supervision over, or the management of the little modicum of personal property, usually to be found in the possession of an Indian. In practice, it is believed, that no agent ever considered himself clothed with any such power. And, in reference to the care and management of the real estate, every necessary provision had been specifically made. It seems, therefore obvious, that, for these reasons, that provision was omitted.

In some one or more of the States it has been enacted, that no contract with an Indian should be valid, and, in Massachusetts, some of the tribes have been put under guardianship. In this State nothing of the kind has taken place, except to the limited extent before named. The condition of the tribes, remaining in the elder States of the Union, is peculiar. They are, however, human beings, born and residing within our borders. This would, ordinarily, constitute them citizens; and they cannot in all respects, if in any, be considered as aliens. Our constitution seems to contemplate, that, under certain circumstances, they may become voters at our elections. It only excludes such from voting, as are not taxed; thereby implying, if taxed, that they may be voters. Our constitution, moreover, says that "all men are born equally free and independent; and have certain natural, inherent and unalienable rights; among which is, that of acquiring, possessing, and protecting property." Why, then, should the condition of an Indian differ from that of other individuals born and reared upon our own soil? Is it insisted that the Penobscot tribe are a nation by themselves and independent? Our constitution recognizes no such thing, and our legislation altogether forbids it. If one of them should commit a crime, or do any personal injury to one of our citizens, should we hesitate to send an officer into the midst of his tribe to apprehend him? Clearly not. It would be surely otherwise, if they were a nation by themselves. We have in express terms extended our legislation over them; and over their territory; and have even presumed to appoint agents to manage the affairs of the Indians in reference to it. Their

condition then is truly anomalous. Although endowed with the attributes belonging to our species, and in fact, a portion of the human race, and born within our borders, and by the terms of our constitution having seemingly an inalienable right to the acquisition and control of property; yet, as a people, and as it were nationally and collectively, they are treated, and perhaps necessarily so to a certain extent at least, as having none of those attributes. Imbecility on their part, and the dictates of humanity on ours, have necessarily prescribed to them their subjection to our paternal control; in disregard of some, at least, of abstract principles of the rights of man. To the extent to which our laws go in abridging them of their supposed natural right, ordinarily incident to the ownership of property, we must consider them individually and collectively as under our tutelage. As the regulations before stated are in derogation of personal rights, however, we must not extend them beyond what is obviously prescribed.

Their rights to make personal contracts are not, by our statutes, impaired. An Indian of the Penobscot tribe might hire himself out to labor; and his right to sue for and recover an agreed compensation, in his own name is not taken from him. His agreement, if fairly made, would be recognized as valid. If such agreement were to labor for a certain term for a specified price, and after having served a part of the time, if he should causelessly depart and refuse to finish the term, would he have a right, any more than any one else, to recover any thing for what service he had performed? If not it must be because he had power to make a binding contract. And suppose he should be desirous to purchase some article of personal estate, and it should be delivered to him upon his agreeing to pay for it a certain fixed price, by his labor for a specified term of time; and he should fail of performance, would his employer have no right of action against him? Surely he ought to have, and we cannot doubt but he would have redress at law.

In the case of *Thaxter, adm'r.* v. *Grinnell & al.* 2 Met. 13, the plaintiff, having been appointed guardian to the Chappe-

quiddic Indians, and one of them having engaged on board of a whale ship, and having deceased during the voyage, and the plaintiff having taken out letters of administration on his estate, attempted to recover pay for his services, upon the ground, that the contract with the Indian, he being under guardianship, was void. The Court held, as the defendants were not apprised, that the Indian was one of the Chappequiddic tribe, and had been paid the full amount due to him, that the plaintiff could not recover; and that the contract was valid. This case shows very clearly that, aside from any express statutory prohibition, an Indian might make a valid contract.

*Our statute* has authorized the agent or agents to sue for a debt due to an Indian; but it has not, in terms, or by implication, taken away the right of the Indian to sue without the interference of the agents. And the statute has made no provision for any interference of an agent, when a contract is sought to be enforced against an Indian; nor has it, in any way, certainly not in express terms, and we cannot understand that it has by implication, undertaken to shield him from his obligation to perform his promise, whether express or implied, to pay for goods or articles by him received. In this respect he seems to stand in the predicament of any other individual. The note declared on, we must presume, was fairly obtained. If not it would have been made apparent. The slightest imposition in obtaining it would prevent a recovery upon it.