STATE *vs.* PETER NEWELL.

Washington.    Opinion April 19, 1892.

*Indians.    Treaties.    Fish and Game.*

The Indians resident within this State are not "Indian Tribes" within the treaty making powers of the Federal government.

Nor are they in political life, or territory, the successors of any of the various "Eastern Tribes of Indians" with whom treaties were made by the crown, or the colonies, in colonial times; and, hence, they cannot effectually claim any privileges or exemptions under such treaties.

While they have a partial organization for tenure of property and local affairs, they have now no separate political organization, and are subject as individuals to all the laws of the State.

ON REPORT.

This was an indictment charging that the defendant, one of the Passamaquoddy Tribe of Indians, did on the fourteenth day of January, 1891, during close time, at township number six, middle division, an unincorporated place in said county, with force and arms kill and destroy two deer, against the peace, &c., and contrary to the statute in such case made and provided.

Upon arraignment, the defendant pleaded that he was guilty of the offense charged against him, unless the court should be of opinion that he had a lawful right to do the acts with which he was accused by reason of the following treaties, viz :    Of 1725, 1713, 1717, of 1727, of 1749, of 1752, all printed in the Maine Historical Society's publications.

Also treaty of 1794, and other treaties printed in Acts and Resolves of 1843 ; also treaty of 1780.

It was agreed by the parties that the case should be reported to the law court to be there decided as the legal rights of the parties might require.    They also agreed that printed copies of the treaties above named might be referred to and used as contained

VOL. LXXXIV.        31

in any of the publications of the States of Maine and Massachusetts, or in the publications of any one of the Historical Societies.

*Charles E. Littlefield*, Attorney General, and *F. I. Campbell*, County Attorney, for the State.

*George M. Hanson*, for defendant.

EMERY, J.   The defendant admittedly killed two deer in this State contrary to the form, letter and spirit of the statute for the preservation of deer and other game animals.   The only matter of fact he interposes in defense is, that he is an Indian, one of the Passamaquoddy tribe, a tribe living on and near Lewey's Island in the eastern part of the State.

Whatever the status of the Indian tribes in the west may be, all the Indians of whatever tribe, remaining in Massachusetts and Maine, have always been regarded by those States and by the United States as bound by the laws of the State in which they live.   *Danzell* v. *Webquish*, 108 Mass. 133; *Murch* v. *Tomer*, 21 Maine, 535.   Their position is like that of those Cherokees who remained in North Carolina.   It was said of them by the United States Supreme Court, in " *Cherokee Trust Funds*," 117 U. S. 288, that they were inhabitants of North Carolina and subject to its laws.

Indeed, the defendant concedes that he is bound by all the laws of the State, except those restricting the freedom of hunting and fishing.   As to these restrictive statutes, he contends they must give way as to him before certain "Indian Treaties," named in the report of the case.   He claims that these treaties are made by the fifth section of the Act of Separation (incorporated into our Constitution) a constitutional restraint upon the power of the Legislature, to limit the freedom of the Passamaquoddy Indians in hunting and fishing.

The defendant's counsel, with much zeal and industry, has furnished us with many and interesting papers concerning the various treaties with the Indians of Maine and the East.   The treaty of 1713 was "the submission and agreement of the eastern Indians" to and with Governor Dudley at Portsmouth.   It purported to be executed by delegates from "all the Indian plantations on the rivers of St. John, Penobscot, Kenybeck, Amascogon, Saco and Merrimack."   The conference of 1717 was

simply a confirmation of the same treaty. The treaty of 1725 was after the French and Indian wars of that period, and was between the Governors of Nova Scotia, New Hampshire and Massachusetts Bay on the one hand, and "the several tribes,. viz: the Penobscot, Norridgewock, St. Johns, Cape Sable and other tribes inhabiting within New England and Nova Scotia," on the other hand. This treaty was further confirmed in 1727.. In 1749, after another Indian war, commissioners from Governor Phipps made a treaty of peace with " the Indians of the tribes. of Penobscot, Norridgewock, St. Francois and other Indians. inhabiting within his Majesty's territory of New England." The conference in 1752 was only a confirmation of the treaty of 1749. What is called in the report, "the treaty of 1780," appears to be (so far as any papers or citations are furnished us) simply a letter of thanks and kind assurances from Governor Bowdoin to the " different tribes of Indians under Col. John Allan." It contains no mention of hunting and fishing.

We do not find that the Federal government ever by statute or treaty recognized these Indians as being a political community, or an Indian tribe, within the meaning of the Federal Constitution. The defendant's counsel calls our attention to the mission of Col. John Allan, as an envoy from the Continental Congress to these Indians. Col. Allan was appointed by congress in 1777, "Agent for Indian affairs in the Eastern Department," and held that office till 1784. He was instructed to visit " the tribes of Indians, inhabitants of St. John and Nova Scotia," and by threats, persuasions and arguments of various kinds, to endeavor to convince them it would be for their interest not to take part against the United States in the war then raging. He made his headquarters at Machias and assumed a general supervision and a *quasi*-control over the various tribes of Indians from the St. John to the Penobscot. Many of his letters have been preserved by the Indians, and by them submitted to the court. They are full of kindly assurances of protection, including hunting and fishing, but it cannot be seriously claimed that they amount to a treaty between two political communities, however savage one of them may have been.

In the treaties of 1713, 1725, 1749, the contracting Indians reserved to themselves "and their natural descendants respectively, the privilege of fishing, hunting and fowling as formerly." These treaties were made by the crown with actual political communities, which had an internal government, however rude, and an external responsibility, however unsatisfactory, which could wage war and make peace. But, whatever may have been the original force and obligation of these treaties, they are now *functus officio*. One party to them, the Indians, have wholly lost their political organization and their political existence. There has been no continuity or succession of political life and power. There is no mention in the treaties of a tribe called "Passamaquoddy," and we cannot say that these present Indians are the successors in territory, or power, of any tribe named in the treaties, or are their natural descendants.

Though these Indians are still spoken of as the "Passamaquoddy Tribe," and perhaps consider themselves a tribe, they have for many years been without a tribal organization in any political sense. They cannot make war or peace, cannot make treaties; cannot make laws; cannot punish crime; cannot administer even civil justice among themselves. Their political and civil rights can be enforced only in the courts of the State; what tribal organization they may have is for tenure of property and the holding of privileges under the laws of the State. They are as completely subject to the State as any other inhabitants can be. They cannot now invoke treaties made centuries ago with Indians whose political organization was in full and acknowledged vigor.

What the report calls "the treaty of 1794," was simply a grant by the commonwealth to the Passamaquoddy tribe of Indians of certain lands and the privilege of fishing in the Schoodiac river, in consideration of their releasing all claims to other lands in the commonwealth. Clearly the defendant gains no right to hunt under that grant.          *Judgment for the State.*

PETERS, C. J., VIRGIN, LIBBEY, FOSTER and WHITEHOUSE, JJ., concurred.