**JOINT TRIBAL COUNCIL OF the PASSAMAQUODDY TRIBE et al., Plaintiffs-Appellees,**

v.

**Rogers C. B. MORTON, Secretary, Department of the Interior, et al., Defendants-Appellees,**

**State of Maine, Intervenor-Appellant.**

**JOINT TRIBAL COUNCIL OF the PASSAMAQUODDY TRIBE et al., Plaintiffs-Appellees,**

v.

**Rogers C. B. MORTON, Secretary, Department of the Interior, et al., Defendants-Appellants.**

**Nos. 75–1171, 75–1172.**

United States Court of Appeals, First Circuit.

Argued Sept. 11, 1975.

Decided Dec. 23, 1975.

Martin L. Wilk, Deputy Atty. Gen., with whom Joseph E. Brennan, Atty. Gen., was on brief, for State of Maine, Augusta, Me., appellant.

Edmund B. Clark, Atty., Dept. of Justice, with whom Wallace H. Johnson, Asst. Atty. Gen., Walter Kiechel, Deputy Asst. Atty. Gen., and Edward J. Shawaker, Atty., Dept. of Justice, Washington, D. C., for Rogers C. B. Morton, appellants.

Thomas N. Tureen, Calais, Me., with whom David C. Crosby, Barry A. Margolin, Calais, Me., Stuart P. Ross, Hogan & Hartson, Washington, D. C., Robert S. Pelcyger, Boulder, Colo., and Robert E. Mittel, Portland, Me., were on brief for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This is an appeal from a declaratory judgment entered in the District Court for the District of Maine. 388 F.Supp. 649, 667 (D.Me.1975).

Plaintiffs are, under Maine law, the political representatives of the Passamaquoddy Indian Tribe ("the Tribe"). 22 M.R.S.A. § 4831 (Supp.1975). They brought this action against the Secretary of the Interior and the Attorney General of the United States after the Secretary refused to initiate a lawsuit against the State of Maine on behalf of the Tribe. Earlier, in a letter to the Commissioner of the Bureau of Indian Affairs, the Tribe had stated the following grievances against Maine and its predecessor, Massachusetts (hereinafter collectively "Maine"): that Maine had divested the Tribe of most of its aboriginal territory in a treaty negotiated in 1794; that Maine had wrongfully diverted 6,000 of the 23,000 acres reserved to the Tribe in that treaty; and that Maine had mismanaged tribal trust funds, interfered with tribal self-government, denied tribal hunting, fishing and trapping rights, and taken away the right of members to vote, from 1924 to 1967. The Tribe had requested the Secretary to sue Maine on its behalf to redress these asserted wrongs before July 18, 1972, the date an action would allegedly be barred.[1] Although the Commissioner of the Bureau of Indian Affairs favored compliance with plaintiffs' request, defendants did not act.

On June 2, 1972, plaintiffs filed this action, seeking a declaratory judgment that the Tribe is entitled to federal protection under the Indian Nonintercourse Act, 25 U.S.C. § 177,[2] and a preliminary injunction ordering defendants to file a protective action on the Tribe's behalf against the State of Maine by July 18, 1972. Defendants persisted in their refusal to sue for the Tribe, relying upon the advice of the Acting Solicitor for the Department of the Interior, who stated,

"[N]o treaty exists between the United States and the Tribe and, except for authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty."

---

1. 28 U.S.C. § 2415(b) sets forth a special statute of limitations for actions seeking damages resulting from trespass on Indian lands. The time for filing such an action was originally July 18, 1972, but has since been extended by Congress to July 18, 1977. Act of October 13, 1972, P.L. 92–485, 86 Stat. 803.

2. Title 25 U.S.C. § 177 provides as follows:

"No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the

isolated and inexplicable instances in the past, this Department, in its trust capacity, has had no dealings with the Tribe. On the contrary, it is the States of Maine and Massachusetts which have acted as trustees for the tribal property for almost 200 years.

. . .

. . . [W]e are aware that the Tribe may thus be foreclosed from pursuing its claims against the State in the federal courts. However, as there is no trust relationship between the United States and this Tribe, . . . the Tribe's proper legal remedy should be sought elsewhere."

After a hearing, the district court ordered defendants to file suit by July 1, 1972, and to include all matters of which the Tribe had complained. In compliance, they instituted *United States v. Maine,* Civil No. 1966 N.D. An appeal from that order was dismissed on motions of both plaintiffs and defendants. Civil No. 1966 N.D. has meanwhile been stayed pending final determination of the present action.

Plaintiffs then filed two amended and supplemental complaints herein, abandoning their request for an injunction and seeking only a declaratory judgment. The State of Maine was allowed to intervene. As finally framed and argued in the district court, the issues were,[3] (1) whether the Nonintercourse Act applies to the Passamaquoddy Tribe; (2) whether the Act establishes a trust relationship between the United States and the Tribe; and (3) whether the United States may deny plaintiffs' request for litigation on the sole ground that there is no trust relationship. The district court ruled in plaintiffs' favor on all points. Both the federal defendants and the State of Maine appeal. We af-

firm, subject to the qualifications hereinafter stated.

## I

The issues in this proceeding can best be understood in light of facts about the Tribe appearing in the parties' stipulation and exhibits and in the district court's comprehensive and scholarly opinion.[4]

The Tribe now resides on two reservations in Washington County in Maine. Its members and their ancestors, as was agreed below, have constituted an Indian tribe in both the racial and cultural sense since at least 1776. Plaintiffs allege that until 1794 the Tribe occupied as its aboriginal territory all of what is now Washington County and certain other land in Maine. In 1777, the Tribe pledged its support to the American Colonies during the Revolutionary War in exchange for promises by John Allan, Indian agent of the Continental Congress, that the Tribe would be given ammunition for hunting, protection for their game and hunting grounds, regulation of trade to prevent imposition, the exclusive right to hunt beaver, the free exercise of religion, and a clergyman. In addition, an agent would be appointed for their protection and support in time of need. Allan, as Superintendent of the Eastern Indian Agency, reported to the federal government on several occasions in 1783 and 1784 that the Passamaquoddy Tribe had greatly assisted the revolutionary cause and urged Congress to fulfill these promises made on the Government's behalf. Allan also transmitted the views of the Tribe in this regard. However, the Continental Congress failed to act on Allan's recommendations. His appointment was revoked in March 1784, under a resolution revoking the appointments of all Indian Superintend-

---

**3.** Plaintiffs also requested in their second amended and supplemental complaint a declaratory judgment that the U.S.Const. art. I, §§ 8 and 10, and art. II, § 2, are applicable to the Tribe. Relief along these lines was not pursued below and is not now an issue.

**4.** Plaintiffs' contentions that the Department of the Interior has wrongfully turned its back on the Tribe, and that federal guardianship must replace that of the State, are elaborated in detail in O'Toole & Tureen, *State Power and the Passamaquoddy Tribe; "A Gross National Hypocrisy?",* 23 Me.L.Rev. 1 (1971).

ents. In 1790, the First Congress adopted the Indian Nonintercourse Act.[5]

In 1792, the Passamaquoddy Tribe petitioned Massachusetts for land upon which to settle, and Massachusetts appointed a committee to investigate, one member of which was the same John Allan. Allan reported that during the Revolutionary War the Passamaquoddy Tribe had given up its claims to lands known to be its haunts on the condition that the United States would confirm its "ancient spots of ground" and a suitable tract for the use of both the Tribe and all other Indians who might resort there. Soon after, in 1794, Massachusetts entered into an agreement, also referred to as a treaty, with the Passamaquoddy Tribe by which the Tribe relinquished all its rights, title, interest, claims or demands of any lands within Massachusetts in exchange for a 23,000 acre tract comprising Township No. 2 in the first range, other smaller tracts, including ten acres at Pleasant-point, and the privilege of fishing on both branches of the Schoodic River. All pine trees fit for masts were reserved to the state government for a reasonable compensation. An additional ninety acres at Pleasant-point were later appropriated to the use of the Tribe by Massachusetts in 1801.

Since 1789, Massachusetts and later Maine have assumed considerable responsibility for the Tribe's protection and welfare. Maine was a District of Massachusetts until 1819, when it separated from Massachusetts under the Articles of Separation, Act of June 19, 1819, Mass. Laws, ch. 61, p. 248, which were incorporated into the Maine Constitution as Article X, Section 5. The Articles provided that Maine "shall . . . assume and perform all the duties and obligations of this Commonwealth [Massachusetts], towards the Indians within said District of Maine, whether the same arise from treaties, or otherwise . . . ." Maine was thereafter recognized by Congress and admitted to the Union. Act of March 3, 1820, ch. 19, 3 Stat. 544. The Maine Constitution, with the above quoted provision relating to the Indians, was read in the Senate, referred to committee, and finally declared by Congress to be established in the course of the admission proceedings.

Since its admission as a state, Maine has enacted approximately 350 laws which relate specifically to the Passamaquoddy Tribe. This legislation includes 72 laws providing appropriations for or regulating Passamaquoddy agriculture; 33 laws making provision for the appropriation of necessities, such as blankets, food, fuel, and wood, for the Tribe; 85 laws relating to educational services and facilities for the Tribe; 13 laws making provision for the delivery of health care services and facilities to the Tribe; 22 laws making allowance for Passamaquoddy housing; 54 laws making special provision for Indian indigent relief; 54 laws relating to the improvement and protection of roads and water on the Passamaquoddy reservation; and 15 laws providing for the legal representation of the Tribe and its members.

In contrast, the federal government's dealings with the Tribe have been few. It has never, since 1789, entered into a treaty with the Tribe, nor has Congress ever enacted any legislation mentioning the Tribe. In 1824, the Department of War contributed funds to the Tribe, one-third toward the construction of a school, pursuant to an act for the civilization of Indian tribes. Act of March 3, 1819, 3 Stat. 516. It also gave money annually

---

5. The first Nonintercourse Act, 1 Stat. 137, 138, provided that "no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state . . . unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." This was amended in 1793, 1 Stat. 329, 330: "No pur- chase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution." Subsequent amendments have made no major changes and the present version was enacted in 1834. (See note 2 supra.)

from 1824 to 1828 under the same act to Elijah Kellogg of the Society for the Propagation of the Gospel Among the Indians, to support a school for the Tribe. The funds were granted at the request of the State of Maine, were channeled through the State, and were subject to State controls. Kellogg, according to one nineteenth century source, was himself sent to the Tribe as a schoolmaster by the State of Maine, and as a missionary by the Missionary Society of Massachusetts. These funds were withheld during 1829 because of intra-tribal differences concerning the religion of the Superintendent of the school and, as a result, two principal men of the Tribe, Deacon Sockbason and Sabattis Neptune, went to Washington to meet with Thomas L. McKenney, Director of the Office of Indian Affairs, and John H. Eaton, Secretary of War, to seek reinstatement of the school funds and additional money to hire a priest and to purchase a parcel of land. Money was again appropriated for the school and the priest in 1830, although discontinued after 1831 on account of the same intra-tribal differences. However, despite a request from President Jackson, Congress failed to appropriate any money to purchase land for the Tribe. After the school funds were again suspended during 1831 because of the same sectarian strife, the Tribe requested that the funding be reinstated and used for the improvement of the Tribe's agriculture; this request was also denied and the funding was never resumed. During the period from 1899 to 1912, five members of the Tribe attended the Carlisle Indian School for short periods of time. A member of the Tribe also graduated from Haskel Indian College in 1970. Since 1965, various federal agencies other than the Department of the Interior have provided funds to the Tribe under federal assistance programs available to all citizens meeting the requirements of the program. Some of these funds were taken from special Indian allocations or were administered by special Indian desks within the various agencies. In 1966, the General Counsel to the Department of Housing and Urban Development, writing to the Commissioner of the Maine Department of Indian Affairs in regard to the establishment of public housing authorities by the governing councils of the Passamaquoddy and Penobscot Tribes, stated in part that "[i]t is our understanding that these tribes do not have any governmental powers in their own right or by virtue of any federal law. . . ."

In 1968, the Tribe brought suit against the Commonwealth of Massachusetts in the Massachusetts state courts alleging that the Commonwealth, with the consent of the federal government, assumed jurisdiction over and responsibility for the Tribe and that by the act admitting Maine into the Union, Congress confirmed and ratified that relationship.

## II

The central issue in this action is whether the Secretary of the Interior was correct in finding that the United States has no "trust relationship" with the Tribe and, therefore, should play no role in the Tribe's dispute with Maine. Whether, even if there is a trust relationship with the Passamaquoddies, the United States has an affirmative duty to sue Maine on the Tribe's behalf is a separate issue that was not raised or decided below and which consequently we do not address. The district court held only that defendants "erred in denying plaintiffs' request for litigation on the sole ground that no trust relationship exists between the United States and the Passamaquoddy Tribe." It was left to the Secretary to translate the finding of a "trust relationship" into concrete duties.

Over the years, the federal government has recognized many Indian tribes, specifically naming them in treaties, agreements, or statutes. The general notion of a "trust relationship," often called a guardian-ward relationship, has been used to characterize the resulting relationship between the federal government and those tribes, *see Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *Cherokee Nation v. Georgia,* 30

U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831); and the cases cited in the district court's opinion, 388 F.Supp. at 662–63. It is the defendants' and the intervenor's contention here that such a relationship may only be claimed by those specifically recognized tribes.

The Tribe, however, contends otherwise. It rests its claim of a trust relationship on the Nonintercourse Act, enacted in its original form by the First Congress in 1790 to protect the lands of "any . . . tribe of Indians." Plaintiffs argue, and the district court found, that the unlimited reference to "any . . . tribe" must be read to include the Passamaquoddy Tribe as well as tribes specially recognized under separate federal treaties, agreements or statutes. As the Act applies to them, plaintiffs urge that it is sufficient to evidence congressional acknowledgement of a trust relationship in their case at least as respects the Tribe's land claims.

Before turning to the district court's rulings, we must acknowledge a certain awkwardness in deciding whether the Act encompasses the Tribe without considering at the same time whether the Act encompasses the controverted land transactions with Maine. Whether the Tribe is a tribe within the Act would best be decided, under ordinary circumstances, along with the Tribe's specific land claims, for the Act only speaks of tribes in the context of their land dealings. If that approach were adopted here, however, the Tribe would be deprived of a decision in time to do any good on those matters cited by the Department of the Interior as reasons for withholding assistance in litigation against Maine. And without United States participation, the Tribe may find it difficult or impossible ever to secure a judicial determination of the claims. Given, in addition, the federal government's protective role under the Nonintercourse Act, see below, it is appropriate that plaintiffs and the federal government learn how they stand on these core matters before adjudication of the Tribe's dispute with Maine.

Yet the resulting bifurcation of decision necessarily restricts the reach of the present rulings. In reviewing the district court's decision that the Tribe is a tribe within the Nonintercourse Act, we are not to be deemed as settling, by implication or otherwise, whether the Act affords relief from, or even extends to, the Tribe's land transactions with Maine. When and if the specific transactions are litigated, new facts and legal and equitable considerations may well appear, and Maine should be free in any such future litigation to defend broadly, even to the extent of arguing positions and theories which overlap considerably those treated here.

Now, however, for purposes of the issues currently existing between themselves and the federal government, plaintiffs are entitled to declaratory rulings on the basis of which courses can be charted and actions planned and taken.

A. *Is the Passamaquoddy Tribe a "tribe" within the Nonintercourse Act?*

■ The district court found the Passamaquoddy Tribe to be within the language of the Nonintercourse Act, "any . . . tribe of Indians." It read the quoted language as encompassing all tribes of Indians. The court reasoned that the Act should be given its plain meaning, there being no evidence of any contrary congressional intent, legislative history, or administrative interpretation; that the policy of the United States is to protect Indian title;[6] that there is no reason why the Passamaquoddy Tribe should be excluded since it is stipulated

---

**6.** Indian title, also called "right of occupancy," refers to the Indian tribes' aboriginal title to land which predates the establishment of the United States. *See, e. g., Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). The right to extinguish Indian title is an attribute of sovereignty which no state, but only the United States, can exercise, the Nonintercourse Act giving statutory recognition to that fact. *Id.* at 667, 670, 94 S.Ct. 772; *O'Toole & Tureen, supra* note 4, at 25–26.

to be a tribe racially and culturally; that there is no requirement that a tribe must be otherwise recognized by the federal government to come within the Nonintercourse Act; and that even if "tribe" is thought to be ambiguous, it should be construed non-technically and to the advantage of Indians so as to include the Passamaquoddy Tribe.

 Intervenor and defendants contend that "any . . . tribe of Indians" is ambiguous; that its proper meaning is a community of Indians which the federal government has at some time specifically recognized; and that the Passamaquoddy Tribe is, in that sense, not a tribe. "No court", says intervenor, "has ever held a statute regulating trade and intercourse with Indians to apply to a tribe which the Federal Government disavows any relationship with. . . ."

But while Congress' power to regulate commerce with the Indian tribes, U.S. Const. art. I, § 8, includes authority to decide when and to what extent it shall recognize a particular Indian community as a dependent tribe under its guardianship,[7] *United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 58 L.Ed. 107 (1913), Congress is not prevented from legislating as to tribes generally; and this appears to be what it has done in successive versions of the Nonintercourse Act. There is nothing in the Act to suggest that "tribe" is to be read to exclude a bona fide tribe not otherwise federally recognized.[8] Nor, as the district court found, is there evidence of congressional intent or legislative history squaring with appellants' interpretation. Rather we find an inclusive reading consonant with the policy and purpose of the Act. That policy has been said to be to protect the Indian tribes' right of occupancy, even when that right is unrecognized by any treaty, *United States v. Santa Fe Pacific R. Co.*, 314 U.S. 339, 345, 347, 62 S.Ct. 248, 86 L.Ed. 260 (1941), *rehearing denied*, 314 U.S. 716, 62 S.Ct. 476, 86 L.Ed. 570 (1942), and the purpose to prevent the unfair, improvident, or improper disposition of Indian lands, *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 119, 80 S.Ct. 543, 4 L.Ed.2d 584, *rehearing denied*, 362 U.S. 956, 80 S.Ct. 858, 4 L.Ed.2d 873 (1960); *United States v. Candelaria*, 271 U.S. 432, 441, 46 S.Ct. 561, 70 L.Ed. 1023 (1926). Since Indian lands have, historically, been of great concern to Congress, *see Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), we have no difficulty in concluding that Congress intended to exercise its power fully.

This is not to say that if there were doubt about the tribal status of the Tribe, the judgments of officials in the federal executive branch might not be of great significance. The Supreme Court has said that, "it is the rule of this court to follow the executive and other political departments of the government, whose more special duty is to determine such affairs." *United States v. Sandoval*, 231 U.S. at 47, 34 S.Ct. at 6, *quoting United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865). But the Passamaquoddies were a

---

**7:** Congress also has "a right to determine for itself when the guardianship which has been maintained over the Indian shall cease." *United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 6, 58 L.Ed. 107 (1913). On the other hand, Congress' power is limited in the sense that it may not bring "a community or body of people within the range of [its] . . . power by arbitrarily calling them an Indian tribe," and may exercise its guardianship and protection only "in respect of distinctly Indian communities." *Id.* It having been stipulated, however, that the Passamaquoddy Tribe is a tribe in both the racial and cultural sense,

there is no question that the Tribe is a "distinctly Indian" community.

**8.** In *United States v. Candelaria*, 271 U.S. 432, 442, 46 S.Ct. 561, 563, 70 L.Ed. 1023 (1926), the Supreme Court, *quoting Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358, 45 L.Ed. 521 (1901), read "Indian tribe," as used in the Nonintercourse Act of 1834, 25 U.S.C. § 177, to mean "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular, though sometimes ill-defined, territory." The Tribe plainly fits that definition.

tribe before the nation's founding and have to this day been dealt with as a tribal unit by the State.[9] *See* 22 M.R. S.A. ch. 1355. No one in this proceeding has challenged the Tribe's identity as a tribe in the ordinary sense. Moreover, there is no evidence that the absence of federal dealings was or is based on doubts as to the genuineness of the Passamaquoddies' tribal status, apart, that is, from the simple lack of recognition. Under such circumstances, the absence of specific federal recognition in and of itself provides little basis for concluding that the Passamaquoddies are not a "tribe" within the Act.

Intervenor cites two cases dealing with the Pueblo Indians of New Mexico for its contention that "tribe" refers only to tribes that have been federally recognized. *United States v. Candelaria, supra*; *United States v. Joseph*, 94 U.S. 614, 24 L.Ed. 295 (1876). In *Joseph*, the Supreme Court found that the Pueblo Indians were not a tribe within the Nonintercourse Act, apparently because of their high degree of civilization and the nature of their earlier relations with the Government of Mexico when they had been under its control.[10] In *Candelaria*, the Court held that the Pueblos did come within the Act, though it did not expressly overrule the *Joseph* view that some tribes, because highly civilized or otherwise, might conceivably be exempt. The Court found that the Pueblos were a simple, uninformed people such as the Act was intended to protect and pointed to federal recognition in the past as evidencing Congress' intention to protect the Pueblos. 271 U.S. at 440–42, 46 S.Ct. 561. These cases lend little aid to intervenor and defendants. The cases do, it is true, suggest that the Act's coverage is limited to tribes consisting of "simple, uninformed people," an interpretation understandable in light of the Act's protective purpose. But it is not claimed that the Tribe and its members are so sophisticated or assimilated as to be other than those entitled to protection. *Cf. Joseph, supra. Candelaria* is cited mainly in support of intervenor's argument that the Act requires federal recognition, but it does not elevate recognition to a *sine qua non*; it merely indicates that if there is a question of inclusion, federal recognition of dependent, tribal status may be helpful evidence of Congress' intent.

■ Appellants also assert that there is significance to Congress' approval of the Articles of Separation between Maine and Massachusetts, providing that Maine would assume the duties and obligations which Massachusetts owed to the Indians. But, as the district court recognized, Maine's assumption of duties to the Tribe did not cut off whatever federal duties existed. Voluntary assistance rendered by a state to a tribe is not necessarily inconsistent with federal protection. *See State v. Dibble*, 62 U.S. (21 How.) 366, 16 L.Ed. 149 (1858). Similarly, Congress' unwillingness to furnish aid when requested did not, without more, show a congressional intention that the Nonintercourse Act should not apply. (*See* Part II, C *infra*.) The reasons behind Congress' inaction are too problematic for the matter to have meaning for purposes of statutory construction. *Cf. Order of Railway Conductors v. Swan*, 329 U.S. 520, 529, 67 S.Ct. 405, 91 L.Ed. 471 (1947).

---

**9.** In *State v. Newell*, 84 Me. 465, 24 A. 943 (1892), it is true, the Maine court disputed the continued viability of the Tribe, apparently on the grounds that its sovereignty, such as the power to make war or peace, and the like, had vanished, and the political and civil rights of its members were enforced only in the courts of the State. Nonetheless that court did acknowledge the Passamaquoddies' tribal organization for certain purposes, *id.* at 468, 24 A. 943, and no federal cases hold that the test of tribal existence for purposes of the Act turns on whether a given tribe has retained sovereignty in this absolute sense.

**10.** The Pueblos had submitted to all laws of the Mexican Government, their civil rights had been fully recognized, and they had been absorbed into the "general mass of the population." *United States v. Joseph*, 94 U.S. 614, 617, 24 L.Ed. 295 (1876).

We have considered appellants' remaining arguments carefully and find them unpersuasive. We agree with the district court that the words "any . . tribe of Indians" appearing in the Act include the Passamaquoddy Tribe.

B. *Is there a trust relationship between the Passamaquoddy Tribe and the federal government?*

■ The district court found that the Nonintercourse Act establishes a trust relationship between the United States and the Indian tribes, including the Passamaquoddy Tribe. It relied on a series of decisions by the Court of Claims, *Fort Sill Apache Tribe v. United States,* 201 Ct.Cl. 630, 477 F.2d 1360 (1973); *United States v. Oneida Nation of New York,* 201 Ct.Cl. 546, 477 F.2d 939 (1973); *Seneca Nation v. United States,* 173 Ct.Cl. 917 (1965), while also finding support in an extensive body of cases holding that when the federal government enters into a treaty with an Indian tribe or enacts a statute on its behalf, the Government commits itself to a guardian-ward relationship with that tribe. *See, e. g., Heckman v. United States,* 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912); *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *Worcester v. Georgia, supra.*

We agree with the district court's conclusions and in large part with its reasoning and analysis of legal authority. That the Nonintercourse Act imposes upon the federal government a fiduciary's role with respect to protection of the lands of a tribe covered by the Act seems to us beyond question, both from the history, wording and structure of the Act and from the cases cited above and in the district court's opinion. The purpose of the Act has been held to acknowledge and guarantee the Indian tribes' right of occupancy, *United States v. Santa Fe Pacific R. Co.,* 314 U.S. at 348, 62 S.Ct. 248, and clearly there can be no meaningful guarantee without a corresponding federal duty to investigate and take such action as may be warranted in the circumstances.

We emphasize what is obvious, that the "trust relationship" we affirm has as its source the Nonintercourse Act, meaning that the trust relationship pertains to land transactions which are or may be covered by the Act, and is rooted in rights and duties encompassed or created by the Act. Congress or the executive branch may at a later time recognize the Tribe for other purposes within their powers, creating a broader set of federal responsibilities; and we of course do not rule out the possibility that there are statutes or legal theories not now before us which might create duties and rights of unforeseen, broader dimension. But on the present record, only the Nonintercourse Act is the source of the finding of a "trust relationship," and neither the decision below nor our own is to be read as requiring the Department of the Interior to look to objects outside the Act in defining its fiduciary obligations to the Tribe.

Once this is said, there is little else left, since it would be inappropriate to attempt to spell out what duties are imposed by the trust relationship. This dispute arises merely from the defendants' flat denial of any trust relationship; no question of spelling out specific duties is presented. It is now appropriate that the departments of the federal government charged with responsibility in these matters should be allowed initially at least to give specific content to the declared fiduciary role.

Thus we are not moved by intervenor's criticism of the lower court's interpretation of cited Court of Claims cases, for those arguments go more to the scope of the federal government's duties under particular circumstances than to the existence of a trust relationship. Nor are we moved by intervenor's other complaint that the judgment below implies some sort of overly "general" fiduciary relationship, unlimited and undefined. A fiduciary relationship in this context must indeed be based upon a specific statute, treaty or agreement which helps define and, in some cases, limit the relevant duties; but, as we have held, the Nonintercourse Act is such a statute.

We affirm, on the basis set forth herein, the finding of a trust relationship and the finding that the federal government may not decline to litigate on the sole ground that there is no trust relationship.

C. *Are plaintiffs precluded by acquiescence or by congressional termination of its guardianship role from now asserting a trust relationship with the federal government?*

■ Intervenor also contends that, under general equitable principles, the Tribe should be precluded from now invoking a trust relationship with the federal government because of its longstanding relationship with the State of Maine. However, once Congress has established a trust relationship with an Indian tribe, Congress alone has the right to determine when its guardianship shall cease. *United States v. Nice*, 241 U.S. 591, 598, 36 S.Ct. 696, 60 L.Ed. 1192 (1916); *Tiger v. Western Investment Co.*, 221 U.S. 286, 315, 31 S.Ct. 578, 55 L.Ed. 738 (1911). Neither the Passamaquoddy Tribe nor the State of Maine, separately or together, would have the right to make that decision and so terminate the federal government's responsibilities.[11]

■ We turn, then, to whether Congress itself has manifested at any time a determination that its responsibilities under the Nonintercourse Act should cease with respect to the Tribe. The district court cited a rule of construction that statutes or treaties relating to the Indians shall be construed liberally and in a non-technical sense, as the Indians would naturally understand them, and never to the Indians' prejudice. *Antoine v. Washington*, 420 U.S. 194, 199–200, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930). We agree with the district court that any withdrawal of trust obligations by Congress would have to have been "plain and unambiguous" to be effective.[12] We also agree that there is no affirmative evidence that Congress at any time terminated or withdrew its protection under the Nonintercourse Act. The federal government has been largely inactive in relation to the Tribe and has, on occasion, refused requests by the Tribe for assistance. Intervenor argues that this course of dealings is sufficient in and of itself to show a withdrawal of protection. However, refusing specific requests is quite different from broadly refusing ever to deal with the Tribe, and, as stated above, there is no evidence of the latter.

■ Intervenor also points to a decision by the Supreme Judicial Court of Maine, *State v. Newell*, 84 Me. 465, 24 A. 943 (1892), which found that the Passamaquoddy Tribe has never been recognized by the fedeal government, and argues that the federal government's failure to react to that decision by recognizing the Tribe in some way amounts to an acknowledgement of that ruling. However, the federal government had no obligation to respond to the state court's decision, which could not affect federal authority with respect to the Tribe. *See Oneida Indian Nation v. County of Oneida, supra.*

We accordingly affirm the district court's ruling that the United States never sufficiently manifested withdrawal of its protection so as to sever any trust relationship. In so ruling, we do not foreclose later consideration of whether Congress or the Tribe should be deemed

---

11. One might argue that, although Congress has not terminated this relationship, the Tribe's own course of dealings with the State of Maine still prevent it from asking Congress for assistance. However, the Indians' presumed helplessness is at the heart of the guardian-ward analogy; to deny the ward a right to call upon the guardian for protection would be to deny that he was incapable of looking out for himself.

12. The Supreme Court has said with respect to the termination of Indian reservations that it will not lightly conclude that a reservation has been terminated and will require a clear indication of that fact. *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

in some manner to have acquiesced in, or Congress to have ratified, the Tribe's land transactions with Maine.

*Judgment affirmed.*