**INDIAN TOWNSHIP PASSAMAQUOD-
DY RESERVATION HOUSING
AUTHORITY et al.**

**v.**

**GOVERNOR OF the STATE of
Maine et al.**

Supreme Judicial Court of Maine.
Argued March 4, 1985.
Decided July 12, 1985.

Tureen & Margolin, Barry A. Margolin (orally), Thomas N. Tureen, Portland, for plaintiffs.

James E. Tierney, Atty. Gen., William R. Stokes (orally), Susan P. Herman, William Laubenstein, III, Asst. Attys. Gen., Augusta, for defendants.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

The plaintiffs, three Indian reservation housing authorities, sought a declaratory judgment in the Superior Court (Kennebec County) that the State of Maine continues to be bound by certain cooperation agreements for municipal services that it entered into with them in 1969 and 1971. Ruling on the parties' cross motions for summary judgment, the Superior Court held that section 12 of the federally enacted Maine Indian Claims Settlement Act of 1980 discharged and released the State from its obligations under the cooperation agreements. On plaintiffs' appeal, we affirm the judgment.

The United States Housing Act of 1937, now codified at 42 U.S.C. §§ 1437–1437q (1978 & Supp.1985), declares that:

It is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the

several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income[.] 42 U.S.C. § 1437. Under the housing act, the federal government, through the Department of Housing and Urban Development (HUD), funnels money to local housing authorities that construct and manage housing projects for low income citizens. The Indians of the State of Maine for many years had suffered the "substandard housing conditions" at which the housing act was targeted, but the tribes were legally incapable of establishing the housing authorities that were a prerequisite to the receipt of federal money. Until the decisions in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649 (D.Me.), *aff'd*, 528 F.2d 370 (1st Cir. 1975), when the courts found that there existed a trust relationship between Maine's Indians and the federal government, the State was generally believed to be responsible for the well-being of the tribes. In 1965 and 1967 the Maine legislature created three Maine Indian housing authorities so that the tribes could benefit from federal housing subsidies.[1] The stated purpose of the authorities was to eliminate the "insanitary, unsafe and overcrowded dwelling accommodations" that constituted "a menace to the health, safety, morals and welfare of the residents of [Maine Indian] reservations." P.L. 1967, ch. 252, §§ 1, 2.

Federal law also requires that before HUD provides loan money to a public housing agency, "the governing body of the locality" must enter into an agreement with the housing authority to provide, *inter alia*, basic municipal services to the project. 42 U.S.C. § 1437c(e)(2). With federal money available for the Indian housing authorities, an issue arose as to which government entity should enter into the "cooperation agreement" with the housing

authorities. Internal HUD memos and letters from HUD to the Maine Department of Indian Affairs demonstrate that the federal funds would be forthcoming *only* if the State, the entity that provided all of the customary municipal services to the reservations, signed a cooperation agreement with each authority. That cooperation agreement was to be in the same form and substance as the cooperation agreements required of towns and cities in situations where they had the legal and financial capacity to enter into such contracts.

To allow the receipt of HUD money by Maine's Indians, the State entered into a cooperation agreement with the Penobscot Tribal Reservation Housing Authority on April 2, 1969; and identical agreements with the Indian Township Passamaquoddy Reservation Housing Authority on October 1, 1969, and with the Pleasant Point Passamaquoddy Reservation Housing Authority on March 8, 1971. Each agreement required that the State "[f]urnish ... public services and facilities of the same character and to the same extent as are furnished ... to other dwellings and members of the Tribe," accept dedication of streets, release the State's interest in areas needed for development, provide water and sewer services and provide the authorities upon request with the use of State purchasing facilities and with funds or personnel for project management, repairs, and legal services. As required by HUD, the parties also agreed that, so long as any contract for loans or contributions between the authority and the federal government remained in force, or so long as bonds issued in connection with the funded projects remained unpaid, the agreement could not "be abrogated, changed or modified without the consent of the [federal] Government."

In addition, HUD required that each tribe enter into similar undertakings with the authorities, as the federal agency informed the State, "in order to provide for

---

1. P.L. 1965, ch. 280, as amended by P.L. 1967, ch. 252 (formerly codified at 22 M.R.S.A. §§ 4731–4739), and repealed by P.L. 1979, ch. 732, §§ 16–18.

the possibility that the Tribe may in the future be in a position to furnish services to the reservation heretofore furnished by the State[.]" With the agreements in place, the Indian housing authorities constructed and managed the much-needed dwellings.

In 1980 the United States Congress enacted the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721–1735 (1983 and Supp.1985). In that legislation Congress gave its approval to a settlement of lawsuits brought by the United States on behalf of the Penobscot Nation, the Passamaquoddy Tribe, and the Houlton Band of Maliseet Indians to resolve their land claims against the State under the Trade and Intercourse Act of 1790. Section 12 of the settlement act, codified at 25 U.S.C. § 1731, provides:

> *Except* as *expressly* provided herein, this subchapter shall constitute a *general discharge and release of all obligations of the State of Maine* and all of its political subdivisions, agencies, departments, and all of the officers or employees thereof *arising from any* treaty or *agreement with, or on behalf of any Indian nation, or tribe or band of Indians* or the United States as trustee therefor, including those actions now pending in the United States District Court for the District of Maine captioned United States of America against State of Maine[.]

(Emphasis added)

▇▇▇ The issue in the case at bar is whether section 12 discharged the State of Maine from its obligations under the cooperation agreements.[2] We find that, given the legal framework required for receipt of federal housing moneys that existed at the time the pacts were signed, the agreements between the authorities and the State were made "on behalf of" the Indian tribes. In addition, we believe that the overriding purpose of the 1980 act was to effect a comprehensive settlement between the Indians and the State of Maine. Accordingly, we hold that the discharge of the State from any and all obligations it had to the Penobscot Nation and Passamaquoddy Tribe necessarily includes the State's obligations under the cooperation agreements.

In view of the pre-1975 relationship between Maine's Indians and the State and under the laws and regulations governing the availability of federal housing funds in the late 1960's and early 1970's, it is clear that by entering into the cooperation agreements the State was acting on behalf of the Indian tribes. During that period, the Indians were recognized as tribes whose protection and welfare were entrusted to the State. *See Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d at 374–75. In signing the cooperation agreements, the State complied with the requirements of the United States Department of Housing and Urban Development and stepped into the place of the Indian tribes because, in the words of HUD's counsel, "those tribes then lacked the power and funds to provide [municipal] services." Without the State's participation, the housing projects would never have become a reality, and the tribes would have been denied the new housing they needed desperately. To say that by signing the cooperation agreements the State was doing anything other than acting "on behalf of" the reservation Indians and their tribes ig-

---

**2.** In a preliminary argument, the State maintains that this suit is barred, either because it does not present a real case or controversy, or because of the doctrine of sovereign immunity. There is no merit in either contention. First, there exists here the necessary "active dispute of real interests between the litigants." *Randlett v. Randlett,* 401 A.2d 1008, 1011 (Me.1979). Relief by way of declaratory judgment is appropriate where the basic issue underlying the claim of the plaintiffs is the interpretation or enforcea-

bility of a contract. *See, e.g., Concord Gen. Mut. Ins. Co. v. Home Indem. Co.,* 368 A.2d 596, 597 (Me.1977) (motor vehicle insurance policy). Second, in 22 M.R.S.A. §§ 4731–4739 (1980), which, *inter alia,* authorized the State to enter into agreements with the Indian housing authorities, we find precisely "the general statutory scheme . . . concerning a particular subject matter" from which the State's consent to be sued may justifiably be implied. *Drake v. Smith,* 390 A.2d 541, 545 (Me.1978).

nores the reality of the required legal structure for receipt of the federal funds. In every practical and functional sense, the obligations assumed by the State in the cooperation agreements fall within the plain meaning of the words of section 12.

In reaching our decision we are also mindful of the comprehensive purpose of the settlement act. That act laid out in precise fashion the relationship thenceforth between the State and Maine's Indians. *See Penobscot Nation v. Stilphen,* 461 A.2d 478, 487 (Me.1983). The broad language of section 12 of the act released "all obligations of the State of Maine" "[e]xcept as expressly provided [t]herein." Although there is a dearth of legislative history relevant to section 12, given the general purpose of the act and its all-inclusive wording, we find that the act was intended to "wipe the slate clean" so far as the State's obligations to the Indians were concerned. In the new relationship between the State and the Indians, the State's duties under the cooperation agreements ended and the tribes became responsible for the delivery of municipal services to the housing projects. Indeed, this turn of events should come as a surprise to no one. Before the projects began, HUD required that the tribes adopt resolutions similar in substance to the cooperation agreements in order that the funding continue when and if the tribes became legally and financially capable of providing municipal services. After the passage of the settlement act, the tribes for the first time had both the obligation and the ability to take on the usual responsibilities of municipalities to federally funded housing authorities within their jurisdiction.

The Superior Court correctly ruled that the Maine Indian Claims Settlement Act of 1980 discharged the State of Maine from its prior obligations under the cooperation agreements with the Indian housing authorities. Accordingly, the entry is:

Judgment affirmed.

NICHOLS, VIOLETTE, WATHEN and GLASSMAN, JJ., concurring.

SCOLNIK, Justice, dissenting.

In its desire to "wipe the slate clean," the Court goes beyond Congress's purpose of redefining the "trust" relationship between the tribes and the State of Maine. With this decision the Court relies on the Settlement Act of 1980 to abrogate also an arrangement that included the federal Department of Housing and Urban Development (HUD), which arose out of a situation distinct from the "trust" under which the Indians lived until 1980. Congress intended only to release the State from claims for land transfers and other transactions it had undertaken in its fiduciary role. It did not intend to eliminate important guarantees on which the federal government had conditioned the provision of funds to the Authorities, solely because the ultimate beneficiaries were Indians. Since the language of the Settlement Act does not require abrogating the Cooperation Agreements, and since there is no other indication that Congress so intended, I respectfully dissent.

The Cooperation Agreements to which the State bound itself in 1969 and 1971 may not "be abrogated, changed or modified without the consent of the [federal] Government" so long as any contributions contract between the Authorities and HUD remains in force, or so long as the bonds remain unpaid. Each Agreement requires that the Authority "at all times retain, preserve, and enforce its rights thereunder." Complying with this provision, the Authorities seek here to prevent the State from reneging while both contributions contracts and bonds remain outstanding. There has been no express "consent of the Government" to release the State, either by HUD or by Congress. The State may prevail, then, only if such consent is implicit in the language of the Settlement Act.

The Court should not leap to that conclusion without carefully examining the Act, since "the language of a statute is the best

indication of legislative intent." *A.F.L. & C.I.O. v. Marshall*, 570 F.2d 1030, 1036 (D.C.Cir.1978); *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). The heart of the Settlement Act is 25 U.S.C. § 1723. That section ratified all previous land transfers by or on behalf of the tribes or individual Indians and extinguished all related claims. In 25 U.S.C. § 1731 the Act also provides,

> [e]xcept as expressly provided herein, this subchapter shall constitute a general discharge and release of all obligations of the State of Maine and all of its political subdivisions, agencies, departments, and all of the officers or employees thereof arising from any treaty or agreement with, or on behalf of any Indian nation, or tribe or band of Indians or the United States as trustee therefor, including those actions now pending in the United States District Court for the District of Maine captioned United States of America against State of Maine (Civil Action Nos. 1966–ND and 1969–ND).

This section includes the claims in the then-pending federal litigation, though they had also been discharged by 25 U.S.C. § 1723. That Congress saw fit to repeat itself makes clear that its principal concern was the settlement of *land* claims. Nonetheless, Section 1731 is broader, and we must read it closely to evaluate the State's argument that Congress therein implied its consent to release the State from its obligation under the Cooperation Agreements.

The sole issue is whether these contracts are included by the phrase, "treaty or agreement with, or on behalf of any Indian nation, or tribe or band of Indians." If not, the broad language with which the section begins is irrelevant, since it grants a "general" discharge *only* of obligations arising from such treaties or agreements.[1] The State entered the Agreements "with" the

plaintiff Authorities, and not "with ... any Indian nation, tribe or band of Indians." Thus we must determine whether it or the Authorities did so "on behalf of" the Penobscot Nation or Passamaquoddy Tribe in the sense that Congress intended that phrase to have in Section 1731.

It is a "well-known maxim of statutory construction that, when the same terms are used in different sections of a statute, they receive the same meaning." *Firestone v. Howerton*, 671 F.2d 317, 320, n. 6 (9th Cir.1982). Congress used the words "on behalf of" in four other sections of the Settlement Act, 1723(1), (2), (3), and 1724(f). The references to transfers of land "on behalf of" the tribes or their members in Sections 1723(1) and (3) clearly refer to the early treaties entered into by agents for the tribes.[2] The phrase "on behalf of" is used in Section 1723(2) and, again, in subsection (3) to describe claims made by the United States in the "fiduciary role" imposed on it by the Nonintercourse Act of 1790, *see Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 379 (1st Cir.1975), *viz.*, the role in which it prosecuted the claims resolved by the Settlement Act. Similarly, "on behalf of" is used in Section 1724(f) to describe federal expenditure of money from the Settlement Fund and Acquisition Fund that Congress placed "in trust," §§ 1724(b), (c), in settlement of the Indian land claims. In each of these four sections the phrase "on behalf of" means "by another as agent for" or "in trust for" the tribes. Congress must be presumed to have intended the same meaning, connoting a fiduciary relationship, when it used the same phrase in Section 1731.

The plaintiff Authorities did not act "on behalf of" the Penobscot Nation or Passamaquoddy Tribe in entering the Cooperation Agreements. The Authorities were

---

**1.** For that reason the Court's opinion inappropriately finds additional support for its result in the introductory language. If the central textual analysis does not stand alone, it is not buttressed by the words "except as expressly provided" and "all obligations."

**2.** *See, e.g.,* Treaties and Agreements of 1818 and 1820, published in *Acts & Resolves of Maine (1842–44)*, p. 253–261.

created under State law as independent public corporations to carry out the federal housing program. Each Authority is solely responsible for its acts and contracts. We have long recognized the independent legal identity of such public corporations. "The principle that the Legislature may establish public authorities which exist as distinct and separate corporate bodies the obligations of which are not debts of the state or municipality is fully accepted in this state." *Maine State Housing Authority v. Depositors Trust Co.,* 278 A.2d 699, 707 (Me.1971).

Other courts have almost uniformly applied the same principle to Indian Housing Authorities and similar Indian public corporations. Whether established by tribal ordinance or, as in Maine, by State law, the Indian Housing Authorities have been held to be independent corporations and not agents of the tribes. *See, e.g., J.W. Praught Co. v. Penobscot Tribal Reservation Housing Authority,* C.A. 79–40–B (U.S.D.C. Me. July 18, 1983, slip op. at 6); *R.C. Hedreen Co. v. Crow Tribal Housing Authority,* 521 F.Supp. 599, 605–06 (D.Mont.1981). Given their distinct legal identity, the plaintiff Authorities cannot be deemed to have acted "on behalf of" the Tribes. Nothing in the Cooperation Agreements themselves suggest that the Authorities were acting in a fiduciary capacity.

The next question is whether the State itself acted "on behalf of ... any Indian nation, tribe or band of Indians" when it pledged its cooperation. The Court correctly recognizes that the policy of the United States Housing Act of 1937 is critical to the question of the status in which the State signed the Cooperation Agreements. It also correctly recognizes that the Housing Act required the State, as "the entity that provided all of the customary municipal services *to the reservations*" (emphasis added), to sign the Agreements. The Court is mistaken, I think, in making the leap from this circumstance to the conclusion that the State thereby acted "on behalf of"

*the tribes* in the sense that Congress used that phrase in 25 U.S.C. § 1731.

The policy of the Housing Act is "to promote the general welfare of the Nation by [*inter alia,* alleviating] the acute shortage of decent, safe, and sanitary dwellings for families of lower income." 42 U.S.C. § 1437. Its reach is throughout the United States, without regard to reservation boundaries or ethnic classifications. Federal funds are provided through loans and contributions directly to the local public housing authorities. The annual contributions are provided by the federal government in order to maintain the low-income character of the housing projects. 42 U.S.C. § 1437c(a). To this same end HUD may include in "any agreement or instrument made pursuant to this chapter," any "covenants, conditions, or provisions" deemed necessary. 42 U.S.C. § 1437d(a).

No federal assistance may be provided, by way of loan or annual contribution, "unless the governing body of the locality involved has entered into an agreement with the public housing agency providing for the local cooperation required by [HUD] pursuant to this chapter." 42 U.S.C. § 1437c(e)(2). This ensures that all services necessary to the provision of uniformly safe and sanitary housing in the area will be furnished. *See Mahaley v. Cuyahoga Met. Housing Auth.,* 355 F.Supp. 1245, 1248 (N.D.Ohio 1973). HUD requires such cooperation for purely pragmatic financial reasons. Obliged by statute to maintain the projects' low-income character through subsidies, HUD seeks to ensure that its budgeted "contributions" will not be exceeded by having to provide increasing levels of "municipal" services over the life of the federally-guaranteed Housing Authority bonds. This concern, again, is uniform regardless of where the project is or who its residents are.

Although 42 U.S.C. § 1437c(e)(2) refers only to a Cooperation Agreement with "*the* governing body of the locality involved," it is clear from HUD's actions in practice that *all* governing bodies whose services, facili-

ties, or tax exemptions are deemed necessary will be required to sign Cooperation Agreements as a condition of obtaining the federal funds. HUD's Public Housing Development Handbook 7417.1 Rev–1 (1980), states, at § 2–6(b),

> [a] separate Cooperation Agreement with agencies other than the governing body of the community in which the project will be located is necessary when:
> (1) services or facilities must be obtained from a governing body other than the one that established the [public housing authority];
> (2) a project is located in an area within the jurisdiction of two or more governing bodies that have split responsibilities for providing services and facilities;
> (3) required by state law; or
> (4) other public agencies are responsible for providing services or facilities essential to the project.

Similarly, HUD's practice with regard to Indian Housing Authorities not established by tribal ordinance is that,

> [i]n some cases additional Cooperation Agreements may be required with other public bodies where state law requires or where necessary to secure services essential to the project. An IHA may have to enter into separate Cooperation Agreements with different local governing or taxing bodies where projects are located in different jurisdictions or where local government powers are divided among different bodies.

Interim Indian Housing Handbook 74401 (1976), §§ 13(c)(2), (3). Whether or not separate Cooperation Agreements are required in any particular case is HUD's decision. *Id.*

Though it is arguable that the Tribes were *also* "local governing bodies" within the meaning of 42 U.S.C. § 1437c(e)(2),[3] each of these projects was, at best, "locat-

ed in an area within the jurisdiction of two or more governing bodies that have split responsibilities for providing services and facilities," the State being one of them. The State's interest in entering the Cooperation Agreements for these housing projects is set out at length in 30 M.R.S.A. § 4553 (1980), the "Declaration of Necessity" for public housing in Maine. After a lengthy exposition of the poor condition of low-income housing in Maine, that section declares, "that it is the policy of this State to assist its residents in securing equal opportunity for the full enjoyment of" a wide choice of decent, needed housing. The reservation Indians were Maine residents, without federal recognition, who would have been without the federal housing assistance available to all other low-income Maine residents unless the State entered these Agreements. At that time the State was the only "local governing body" providing the services HUD required. As such, it entered the Cooperation Agreements on *its own* behalf, in order to assist its residents as set forth in 30 M.R.S.A. § 4553.

The Court's only argument that the State acted "on behalf of" the tribes is that the tribes then "lacked the power and funds to provide such services." More important, the tribes also lacked the *obligation* to do so.[4] Had they had such an obligation, their lack of funds might have prompted the State to act as their representative. But here, the tribes had no such obligation and, by 30 M.R.S.A. § 4553, the State did. The State did not enter the Cooperation Agreements as the fiduciary of the tribes.

According to the Court's opinion, "[t]o say that by signing the cooperation agreements the State was doing anything other than acting 'on behalf of' *the reservation Indians and their tribes* ignores the reality of the required legal structure for receipt of the federal funds." (emphasis add-

---

3. *See* 22 M.R.S.A. § 4739 (1980), enacted by P.L. 1967, ch. 252, § 8 and repealed by P.L. 1979, ch. 732, § 18.

4. Until the passage of 30 M.R.S.A. § 6206(1) (1980) the tribes had no taxing power that might have suggested such an obligation. *See Penobscot Nation v. Stilphen*, 461 A.2d 478, 490 (Me. 1983).

ed). With all due respect, the issue posed in this case is only whether the State acted "on behalf of" *the tribes.* Certainly the State acted for the benefit of individual Indians. After all, they were Maine residents. But even if the words "on behalf of" in the Settlement Act could be read loosely to mean "for the benefit of," the application of that phrase in Section 1731 is specifically limited to "Indian nation, tribe or band." Elsewhere in the Settlement Act, notably the crucial Section 1723, Congress referred to transfers and claims by, or on behalf of, *"any Indian,* Indian nation, or tribe or band." *E.g.,* 25 U.S.C. §§ 1721(a)(2), (b)(4), 1723(a)(1), (2), (b), (c), 1724(e), (g)(1), 1725(a), (d)(1), (i), 1732, 1735(b) (emphasis added). On the other hand, the Act also frequently refers to actions specifically on behalf of, or for the benefit of, the tribes themselves. *E.g.,* §§ 1724(b)(1), (g)(1), (3), (h), 1728(a). The final draft of Section 1731 refers only to the "nation, tribe or band," and not to the members thereof. Because Congress obviously knew how to distinguish between actions for the benefit of the tribes and those for the benefit of their members in other sections, the Court errs in expanding the meaning of Section 1731 to erase that distinction here.

The Court asserts that the tribes bound themselves to take the State's place when they "became legally and financially capable," but, again, it assumes too much. While the tribes did resolve to provide some of the services the State also contracted to provide, the tribes' resolutions do not refer to picking up where the State leaves off, if that circumstance was even contemplated in 1969. Instead the resolutions encompass action contemporaneous

with the State's. They are evidence only of HUD's cautious approach to ensuring that its budget will not be exceeded by requiring agreements with every local body in a governing capacity.[5] In this case, however, the tribes entered into no Cooperation Agreements with the Authorities, and it is by no means clear that either the Authorities or HUD could enforce the resolutions.

Assuming, *arguendo,* that the Authorities could enforce the resolutions as contracts, there would still be no replacement for those services that the State contracted to provide, but that are not mentioned in the resolutions. The combined effect of the resolutions and the Settlement Act would not be to substitute the tribes as parties to the Cooperation Agreements and obligate them to perform the State's commitments thereunder. After the Court's decision no party will be bound to provide the services. I do not believe Congress intended the sweep of the Settlement Act to be so broad as to remove the security for federal housing funds on which HUD so cautiously insisted.

The Court finds, nevertheless, that, "given the general purpose of the act and its all-inclusive wording ... it was intended to 'wipe the slate clean' so far as the State's obligations to the Indians were concerned." As noted at footnote 1 above, the "all-inclusive wording" has no significance unless the specific phrase "on behalf of" applies. Nor is the Court's conclusion supported by the "general purpose" of the Settlement Act. No assessment of the general purpose can be made without first examining the *specific* purposes that Congress expressed in 25 U.S.C. § 1721(b).[6] If the Settlement Act was intended to wipe the slate clean of these Cooperation Agree-

---

**5.** *See, e.g.,* HUD Handbooks quoted above.

**6.** 25 U.S.C. § 1721(b) provides,

It is the purpose of this subchapter—
(1) to remove the cloud on the titles to land in the State of Maine resulting from Indian claims;
(2) to clarify the status of other land and natural resources in the State of Maine;

(3) to ratify the Maine Implementing Act, which defines the relationship between the State of Maine and the Passamaquoddy Tribe, and the Penobscot Nation, and
(4) to confirm that all other Indians, Indian nations and tribes and bands of Indians now or hereafter existing or recognized in the State of Maine are and shall be subject to all laws of the State of Maine, as provided herein.

ments, that purpose cannot be inferred from subsections (1), (2), or (4) of Section 1721(b). The Court's summary of the Act's general purpose can be derived only from subsection (3), ratifying the Maine Implementing Act, 30 M.R.S.A. §§ 6201–6214 (1980).

The Settlement Act, with the Maine Implementing Act, "quite precisely laid out the relationship thenceforth to obtain" between the tribes and the State. *Penobscot Nation v. Stilphen*, 461 A.2d at 487. That precision makes it the more likely that, had Congress intended to consent to abrogating the Cooperation Agreements, it would have done so expressly. Yet they are not mentioned in either the State or the federal statutes. It is hard to imagine that Congress's implicit consent can be found in its ratification of a State statute from which the ultimate purpose also must be implied.

The general purpose that does clearly appear in both statutes is to institute a relationship between the federal government and the tribes that is consistent with the fiduciary role imposed upon the United States by the Nonintercourse Act of 1790. *See Joint Tribal Council of Passamaquoddy Tribes v. Morton*, 528 F.2d at 375–379. To that end these statutes eliminated the "trust" relationship with the tribes that the State had assumed only because of the United States' abstention. The statutes did not also abrogate the existing relationship with HUD created for the purpose of fulfilling State and federal obligations to indigent Americans in general, simply because some of the beneficiaries were Indians.

For the foregoing reasons I would reverse the judgment of the Superior Court.