2001 ME 68

**GREAT NORTHERN PAPER, INC., et al.**

v.

**PENOBSCOT NATION et al.**

Supreme Judicial Court of Maine.

Argued: Feb. 13, 2001.

Decided: May 1, 2001.

Catherine R. Connors, Esq. (orally), Matthew D. Manahan Esq., Brian M. Rayback Esq., Pierce Atwood, Portland, for plaintiffs.

Kaighn Smith Jr., Esq. (orally), Gregory W. Sample, Esq., Drummond Woodsum & MacMahon, Portland, Mark A. Chavaree, Esq., Indian Island, Old Town, for defendants.

G. Steven Rowe, Attorney General, William R. Stokes, Asst. Attorney General (orally), Augusta, for intervenor State of Maine.

Dean A. Beaupain, Esq., Millinocket, Loretta M. Smith, Esq., New England Legal Foundation, Boston, MA, for amici curiae Towns of Bucksport, Houlton, Lincoln, Millinocket, Orono, and Patten; Houlton Water Company, Lincoln Sanitary District, Milo Water District, Winterport Sewer District; Maine Chapters of the Pulp & Paperworkers Resource Council, Casco Bay Energy Co., LLC, and Penobscot Frozen Foods, Inc.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and ALEXANDER, JJ.

SAUFLEY, J.

[¶ 1] This case requires us to decide whether the Maine Freedom of Access Act, 1 M.R.S.A. §§ 401–410 (1989 & Supp. 2000), which is ordinarily applicable to municipalities and other components of state government, is applicable to the Penobscot Nation and the Passamaquoddy Tribe. We conclude that the Act does not apply to the Tribes when they act in their municipal capacities with respect to internal tribal matters. We further conclude that the Act does apply to the Tribes when they interact with other governments or agencies in their municipal capacities.

[¶ 2] The dispute before us began when Great Northern Paper, Inc., Georgia–Pacific Corporation, and Champion International Corporation filed a complaint pursuant to the Freedom of Access Act, 1 M.R.S.A. §§ 401–410, seeking certain documents in the Tribes' possession. Ultimately, the Superior Court (Cumberland County, *Crowley, J.*) denied the Tribes' motion to dismiss the complaint and granted the paper companies' motion for summary judgment, thereby requiring the Tribes to turn over the documents requested by the paper companies. We affirm the judgment in part and vacate in part.

## I. BACKGROUND

[¶ 3] The facts relevant to our analysis are not disputed. Great Northern Paper, Inc., is a Maine corporation that owns and operates pulp and paper mills in Millinocket and East Millinocket, both of which discharge treated wastewater into the West Branch of the Penobscot River, upstream of the Penobscot Indian Reservation. Georgia–Pacific Corporation is a Georgia corporation that owns and operates a pulp and paper mill in Woodland, Maine, which discharges treated wastewater to the St. Croix River, downstream of the Indian Township Reservation of the Passamaquoddy Tribe. The mouth of the St. Croix River is just northwest of the Pleasant Point Reservation of the Passamaquoddy Tribe. Champion International Corporation owns and operates a paper mill in Bucksport, Maine, which discharges treated wastewater into the Penobscot River, downstream of the Penobscot Indian Reservation. All three paper companies have federal and state discharge licenses authorizing their wastewater discharges.

[¶ 4] Pursuant to the National Pollutant Discharge Elimination System program of the federal Clean Water Act, 33 U.S.C.A. §§ 1251–1387 (West 1986 & Supp.2000), the State of Maine has applied to the U.S. Environmental Protection Agency to gain control over the issuance of all wastewater discharge permits in the state. *See* 33 U.S.C.A. § 1342(b) (West 1986 & Supp. 2000). In response to Maine's application, the Tribes urged the EPA to conclude, in part, that the state is not entitled to regulate the water resources within their terri-

tories, because they are entitled to be treated like a separate "state." *See id.* § 1377(e) (West Supp.2000). Upon learning of the Tribes' efforts in that regard, the companies sought information from the Tribes relating to those efforts.[1]

[¶ 5] Through their attorneys, the paper companies served written requests upon the Governors of the Penobscot Nation and the Passamaquoddy Tribe, requesting, pursuant to Maine's Freedom of Access Act, 1 M.R.S.A. §§ 401–410, certain documents relating to the Tribes' efforts to gain regulatory powers over water resources within or adjacent to their borders. Specifically, the companies sought "[a]ll documents," including, without limitation, "notes, records, or minutes of all meetings or proceedings of [the Tribes] ... that relate in any way to":

1. the regulation of water resources within [the Tribes' territories] and in adjacent waters;

2. the State of Maine's application to obtain delegation of permitting authority under the Clean Water Act's National Pollutant Discharge Elimination System program;

3. [the Tribes'] alleged authority to protect or regulate water resources within or adjacent to [the Tribes' territories];

4. efforts by [the Tribes] to obtain "treatment as a State" status pursuant to Section 518 of the Clean Water Act, 33 U.S.C. § 1377;

5. efforts by [the Tribes] to have the U.S. Environmental Protection Agency adopt water quality standards different from those of the State of Maine for any waters located in the State of Maine;

6. any agreements with federal government agencies ... that relate to the protection or study of water or other natural resources.

[¶ 6] The companies sought these documents "to educate themselves regarding issues affecting their discharge permits." They asserted that they were entitled to the documents pursuant to the "public records" provisions of the Freedom of Access Act, 1 M.R.S.A. § 402(3) (1989 & Supp. 2000), and in accordance with Maine's Act to Implement the Maine Indian Claims Settlement, 30 M.R.S.A. §§ 6201–6214 (1996 & Supp.2000) (the Maine Implementing Act),[2] as ratified by Congress pursuant to the Maine Indian Claims Settlement Act of 1980, 25 U.S.C.A. §§ 1721–1735 (West 1983 & Supp.2000) (the Settlement Act).

[¶ 7] The Tribes denied the companies' requests, responding, in part, that "the Maine Freedom of Access Act is inapplicable to [the Tribes]," because "the application of that law ... would amount to state regulation of [the Tribes'] governmental process, policies, and procedures." The Tribes did offer, however, to provide the companies with copies of records in their possession that are "not confidential under [the Tribes'] laws and policies concerning

1. According to the parties, the state's application has been granted with respect to all parts of the state except the tribal territories. The matter of regulating water treatment on tribal land is still pending with the EPA.

2. The Maine Implementing Act was passed in 1980 and became effective later that year when Congress passed the Settlement Act. *See* 25 U.S.C.A. §§ 1721–1722 (West 1983) (ratifying the Maine Implementing Act, which means "section 1, section 30, and section 31, of the 'Act to Implement the Maine Indian Claims Settlement' enacted by the State of Maine in chapter 732 of the public laws of 1979"). Section 6206 of the Maine Implementing Act defines the "[p]owers and duties of the Indian tribes within their respective Indian territories" and sets forth the relationship between the Tribes and the state. 30 M.R.S.A. § 6206 (1996).

matters of tribal government" and are not "privileged from disclosure to adverse parties under ... discovery rules or rules of evidence."

[¶ 8] The companies then commenced this action against the Tribes pursuant to 1 M.R.S.A. § 409(1) (1989), claiming that (1) pursuant to 30 M.R.S.A. § 6206(1) (1996) of the Maine Implementing Act, the Tribes have "all of the rights and are subject to all of the duties, obligations, liabilities, and limitations of municipalities"; (2) the Freedom of Access Act, by its terms, "makes all public records, including all records in the possession or custody of ... the State 'or any of its political subdivisions,' available for public inspection"; (3) the documents requested by the companies are "public records"; and (4) by refusing to comply with the companies' requests, the Tribes have violated the Freedom of Access Act. Soon thereafter, the companies filed a motion for partial summary judgment.

[¶ 9] The Tribes filed a consolidated motion in opposition to the companies' summary judgment motion and in favor of their motion to dismiss the companies' action, arguing that the Superior Court lacked subject matter jurisdiction and that the Act could not, as a matter of law, be invoked against the Tribes, because section 6206(1) of the Maine Implementing Act prohibited direct state regulation of "internal tribal matters."[3] The Superior Court denied the Tribes' motion to dismiss and

granted the companies' motion for partial summary judgment. Subsequently, the Superior Court also denied the Tribes' Rule 60 motion for relief from the judgment denying their motion to dismiss. *See* M.R. Civ. P. 60.

[¶ 10] In its order granting partial summary judgment, the court ordered the Tribes "to turn over all non-privileged documents as well as logs of all documents claimed to be privileged no later than 14 days from the date of this order." The Tribes failed to turn over any documents or logs of any documents claimed to be privileged, and accordingly, the Tribes were deemed to have waived the claims of privilege. Because the Tribes asserted that the Freedom of Access law could not be applied to them in any way, they did not argue that even if the Act applied, the paper companies' requests were overbroad. Consequently, in the absence of a preserved privilege or a request to tailor the paper companies' demands to protect specific internal tribal matters, the Superior Court entered a final judgment in favor of the companies, granting full relief to the companies on their Freedom of Access requests.[4] After being held in contempt of the court for their continuing failure to comply with that order, the Tribes appealed to this Court.[5]

## II. DISCUSSION

[¶ 11] The applicability of the Freedom of Access Act to Maine's Indian Tribes is a

---

**3.** Before us, the Tribes do not contend that the Superior Court lacked subject matter jurisdiction. We take judicial notice of the Tribes' action in the United States federal district court seeking to enjoin the paper companies from invoking the Freedom of Access Act against them. *See Penobscot Nation v. Georgia–Pacific Corp.*, 116 F.Supp.2d 201 (D.Me.2000).

**4.** The Tribes appealed the Superior Court's final judgment only "to the extent" that it denied their motion to dismiss. The court

held a consolidated hearing on the Tribes' motion to dismiss and the companies' motion for summary judgment, considered the exhibits submitted by the parties, and in effect treated the Tribes' motion as a competing motion for summary judgment. We therefore review both the denial of the Tribes' motion and the grant of the companies' motion for summary judgment.

**5.** The Superior Court stayed the order of contempt when the Tribes filed this appeal.

matter of first impression. That Act does not explicitly mention the Tribes as covered by, or excluded from, its terms, nor do either of the Indian land claims settlement acts directly address the applicability of the Freedom of Access Act.

[¶ 12] In construing the statutes before us, we begin with the recognition that the applicability of state statutes to the Tribes occurs in a framework that is unique to Maine. *See* 25 U.S.C.A. §§ 1721–1735; 30 M.R.S.A. §§ 6201–6214. The relationship between the State of Maine and the Tribes is not governed by the general federal laws that define such relationships. *Id.; Penobscot Nation v. Fellencer,* 164 F.3d 706, 708 (1st Cir.1999). Rather, it is governed by the two Acts, one state and one federal, both memorializing a settlement of disputed claims brought by the Tribes in the 1970s against the state for vast portions of Maine land. *See* 25 U.S.C.A. §§ 1721–1735; 30 M.R.S.A. §§ 6201–6214; *see also Passamaquoddy Tribe v. Morton,* 528 F.2d 370, 380–81 (1st Cir.1975); *Penobscot Nation v. Stilphen,* 461 A.2d 478, 482 (Me.1983).

[¶ 13] In order to resolve the question before us, we must construe the Maine Implementing Act, the Federal Settlement Act, and the Maine Freedom of Access Act to determine whether (1) the application of the Freedom of Access Act to the Tribes, as a matter of law, is prohibited by the state and federal settlement acts and, if not, (2) whether any parts of the companies' specific requests are barred by application of the settlement acts.

[¶ 14] Statutory construction is a question of law, and we review the Superior Court's interpretation of the Freedom of Access Act and the Maine Implementing Act de novo. *See Bangs v. Town of Wells,* 2000 ME 186, ¶ 9, 760 A.2d 632, 635; *Francis v. Pleasant Point Passamaquoddy Hous. Auth.,* 1999 ME 164, ¶ 5, 740

A.2d 575, 577. In interpreting the Implementing Act, we look to the Act itself and its legislative history. *Stilphen,* 461 A.2d at 489. The interpretation of the Act by the First Circuit Court of Appeals also provides guidance to our analysis.

[¶ 15] Our main objective in statutory interpretation is to give effect to the Legislature's intent. *N.A. Burkitt, Inc. v. Champion Rd. Mach. Ltd.,* 2000 ME 209, ¶ 6, 763 A.2d 106, 107. To give effect to the Legislature's intent, we look first to the statute's plain meaning and, if there is ambiguity, we look beyond that language to the legislative history to determine the intent of the Legislature. *Kimball v. Land Use Regulation Comm'n,* 2000 ME 20, ¶ 19, 745 A.2d 387, 392.

[¶ 16] Each of the three Acts under scrutiny is devoid of any language that directly addresses the applicability of Maine's Freedom of Access Act to the Tribes. Thus, the question presented cannot be resolved on the plain language of the law. The positions of the competing parties make the ambiguities in the law apparent. The Tribes argue that the Freedom of Access Act may not be invoked against them because the application of the Act would amount to an impermissible regulation of the Tribes' right to control their "tribal government," as prohibited by Maine's Implementing Act, 30 M.R.S.A. § 6206(1). The companies, the state, and the amicus curiae collectively contend that the Tribes agreed to be treated as municipalities under the Maine Implementing Act, 30 M.R.S.A. § 6206(1), and that municipalities are subject to the provisions of the Freedom of Access Act, 1 M.R.S.A. § 402.

[¶ 17] Because the question is not clearly resolved by the language of any of the three Acts under consideration, we turn to the legislative history of those laws to

determine the applicability of the Freedom of Access Act to the Tribes.

### A. The Maine Implementing Act as Ratified by the Federal Settlement Act

[¶ 18] It is frequently noted that the settlement between the State of Maine and the Tribes created a unique new legal relationship between the Tribes and the state. What is sometimes overlooked, however, is the fact that the relationship between the state and the Tribes preceding the settlement was also unique. A thorough understanding of the nature of the settlement requires an understanding of that history.

[¶ 19] Any consideration of Indian law must begin with the basic tenet that the power to regulate Indian affairs originates in Congress. Pursuant to the Commerce Clause of the United States Constitution, Congress has the plenary authority to legislate over Indian affairs, *see* U.S. Const. art. I, § 8, cl. 3, and "only Congress can abrogate or limit an Indian tribe's sovereignty." *Fellencer*, 164 F.3d at 709.

[¶ 20] That congressional authority, however, was traditionally exercised only when the sovereignty of a group of Indians was recognized by the federal government. *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865). From the time that Maine was ushered into the United States as a state separate and independent from Massachusetts in 1820, the United States government consistently declined to recognize or to assume responsibility for the Indians residing in Maine. 25 U.S.C.A. § 1721(a)(9) (West 1983); *Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649, 652–53 (D.Me.1975), *aff'd by* 528 F.2d 370. The State of Maine, in turn, undertook the almost exclusive role of assisting and regulating the Indians residing within its borders. *See* 25 U.S.C.A. § 1721(a)(9); *Murch v. Tomer*, 21 Me. 535 (1842).

[¶ 21] The absence of established tribal sovereignty was evidenced by the state's extensive role in governing the Tribes throughout the history of the State of Maine. Consistent with this role, Maine actively regulated the affairs of Indians within its borders for almost 160 years, creating hundreds of laws that specifically related to the protection and regulation of the Tribes. *See* 22 M.R.S.A. §§ 4701–4836 (1964) (detailing the rules and regulations that apply to the Tribes) (repealed in substantial part by Maine Implementing Act, P.L.1979, ch. 732); *Morton*, 528 F.2d at 374. Indians residing within Maine's borders were subjected to the general laws of the state like "any other inhabitants" of Maine. *State v. Newell*, 84 Me. 465, 24 A. 943, 944 (1892) ("They are as completely subject to the state as any other inhabitants can be."); *Murch*, 21 Me. at 537 ("We have in express terms extended our legislation over them; and over their territory[.]"); *cf. Dana v. Tracy*, 360 F.2d 545, 548 (1st Cir.1966).

[¶ 22] Although the Tribes were recognized in a cultural sense, they were simply not recognized by the state or the federal government in an official or "political sense." *Newell*, 24 A. at 944; *see also Indian Township Passamaquoddy Reservation Hous. Auth. v. Governor of State*, 495 A.2d 1189, 1190 (Me.1985). Prior to the settlement, the federal government never entered into a treaty with the Tribes nor did Congress enact any legislation mentioning the Tribes. *Morton*, 528 F.2d at 374. The regulation by state government, coupled with the total absence of congressional regulation, contrasted sharply with many tribes in other states. *See, e.g., In re Kansas Indians*, 72 U.S. (5 Wall.) 737, 738–39, 18 L.Ed. 667 (1866).

[¶ 23] For more than a century, this situation went substantially unquestioned. *See* H.R. Rep. No. 96–1353 (1980), 1980

U.S.Code Cong. & Admin.News p. 3786. In 1975, however, the Tribes' relationship with the state and the federal government changed substantially as a result of a significant court decision. *See Morton*, 528 F.2d at 380–81. Early in the 1970s, the Tribes had asserted claims for vast portions of lands in Maine on the basis that the lands in question had been transferred from them in violation of the federal Indian Nonintercourse Act of 1790, which protected "any ... tribe of Indians." *Id.* at 372–73. The Tribes asked the Department of Interior, Bureau of Indian Affairs, to file a protective action on the Tribes' behalf against the State of Maine, to reclaim the lands that had allegedly been transferred in violation of the Act. *Id.* at 372. Consistent with its historic approach to Maine's Tribes, the Department denied the Tribes' request, asserting, among other things, that the federal government had never formally recognized the Tribes and that it had no trust relationship with the Tribes. *Id.* at 372–73.[6]

[¶ 24] The Tribes then sued to force the Department to act on their behalf. Ultimately, the United States Court of Appeals for the First Circuit rejected the Department's views and held that the Indian Nonintercourse Act applied to the Tribes, despite the absence of "specific federal recognition," and that the resulting trust relationship obligated the federal government, at a minimum, to investigate the Tribes' claims and take such action as may be warranted. *Id.* at 378–81.

[¶ 25] The *Morton* decision had several significant effects on the relationship between the Tribes and the state. First, pursuant to the newly recognized federal trust relationship, a fiduciary duty was imposed upon the federal government, requiring it to act on behalf of the Tribes to investigate the validity of their claims against the State of Maine. Second, the continuation of Maine's jurisdiction over the Tribes began to be questioned because the Tribes could potentially invoke the application of other federal statutes on their behalf. *See, e.g., State v. Dana*, 404 A.2d 551, 554 (Me.1979) (recognizing that the Tribes may be entitled to protections of the federal Major Crimes Act of 1885, which granted exclusive federal jurisdiction over certain crimes committed by Indians in "Indian country").[7] Consequently, because the state's relationship with the Tribes was called into question, significant concerns were raised regarding the possibility that the state would discontinue its substantial financial support of the Tribes.[8]

---

**6.** On June 23, 1972, the Tribes obtained a preliminary injunction to force the federal government to file suits on their behalf. *See Passamaquoddy Tribe v. Morton*, 388 F.Supp. 649, 654 (D.Me.1975). On June 29, 1972, while maintaining that it was not obligated to act on behalf of the Tribes, the federal government filed two suits, *United States v. Maine*, Civil Nos.1966 & 1969 N.D., against the State of Maine on behalf of the Passamaquoddy Tribe and the Penobscot Nation. *Id.* at 653–54, 669 n. 6 (citing Letter from Acting Solicitor of the Department of the Interior, to Assistant Attorney General, Land and Natural Resources Division, Department of Justice (June 20, 1972)). Subsequently, by court's order, those suits were held in abeyance on the court's docket pending full resolution of the legal issues presented in *Passamaquoddy Tribe v. Morton. Id.* at 669 n. 6.

**7.** Similarly, in 1979, prior to the enactment of the settlement acts, the U.S. Court of Appeals for the First Circuit concluded that the Passamaquoddy Tribe was protected from suits by the common law doctrine of sovereign immunity. *Bottomly v. Passamaquoddy Tribe*, 599 F.2d 1061, 1066 (1st Cir.1979) (citing *United States v. Wheeler*, 435 U.S. 313, 322–23, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)) (reasoning that the inherent powers of the Indian tribes are, in general, those of a limited sovereign, which may not be extinguished absent express Congressional intent).

[¶ 26] Amidst the turmoil created by the unsettling effect of the land claims and the disruption of decades of understanding regarding the state's relationship with the Tribes, the Justice Department indicated that it would be forced to pursue the lawsuit against the state on behalf of the Tribes unless the parties could find a way to settle their dispute. Settlement efforts began in earnest in 1977. At least three separate settlement proposals were structured, but ultimately rejected, over the next two years.[9]

[¶ 27] Although the issues which initially presented obstacles to resolution were undoubtedly numerous, several key points of dispute arose during the parties' negotiations. First, the Tribes asserted that they were entitled to receive more land or funds than the proposals carried. Second, identifying the extent of the Tribes' sovereignty and authority over natural resources on tribal land was a source of frequent dispute. And, finally, the specific delineation of the relationship between the state and the Tribes was problematic. The state was resistent to any settlement that would create a "nation within a nation."[10] The Tribe wished to obtain as much autonomy, or sovereignty, as possible. The future nature of the relationship between the state and the Tribe was thus pivotal in the parties' discussions of compromise.

[¶ 28] It was against this backdrop that the final settlement agreement was reached in 1980. Both sides benefitted from the bargain, *see, e.g., Indian Township Passamaquoddy Reservation Hous. Auth.*, 495 A.2d at 1191–92, and the final agreement represented a compromise in the truest sense. All parties gained something and lost something in the final analysis.

[¶ 29] The Tribes gained, among other things, approximately $81.5 million in trust monies and land assets. 25 U.S.C.A. § 1733 (West 1983). They gained the legal capacity of a municipality and assurance of funds to provide municipal services to their membership. They also gained formal recognition as sovereign entities by the federal government. Thus, because the Tribes in Maine "had not historically been formally recognized as sovereign Indians," the Settlement Act and the Implementing Act memorialized federal recognition of their tribal status, confirmed the Tribes' title to designated reservations lands, and "opened the floodgate for the influx of millions of dollars in federal subsidies." *Akins v. Penobscot Nation*, 130 F.3d 482, 483–84 (1st Cir.1997) (quoting

---

**8.** *See, e.g.,* Memorandum from J.B. Willkie, Facilities Engineer, Eastern Area Office of U.S. Department of the Interior, to Eastern Area Director (June 15, 1979) *in* 3 MAINE JOINT SELECT COMMITTEE ON INDIAN LAND CLAIMS, BACKGROUND INFORMATION ON INDIAN LAND CLAIMS (1980) (on file with the University of Maine School of Law library).

**9.** *See generally* Statement of Maine Attorney General Richard S. Cohen regarding the proposed Maine Indian Land Claims Settlement (March 18, 1980) *in* 2 MAINE JOINT SELECT COMMITTEE ON INDIAN LAND CLAIMS, BACKGROUND INFORMATION ON INDIAN LAND CLAIMS (1980) (on file with the University of Maine School of Law library).

**10.** *See* Testimony of David T. Flanagan on behalf of Governor Joseph E. Brennan, Public Hearing Regarding the Maine Indian Claims Settlement (March 28, 1980) *in* 1 MAINE JOINT SELECT COMMITTEE ON INDIAN LAND CLAIMS, BACKGROUND INFORMATION ON INDIAN LAND CLAIMS (1980) (on file with the University of Maine School of Law library) ("We could never have a nation within a nation in Maine. Such a result would not only be unworkable in a State our size, but it would also promote racial and ethnic hostility and resentment to the ultimate detriment of all of our people.")

*Passamaquoddy Tribe v. State of Maine,* 75 F.3d 784, 787 (1st Cir.1996)).

[¶ 30] The state, in turn, gained closure on the Indian land claims that threatened title to vast areas of the state. The state also retained and clarified its authority to regulate Indian affairs in Maine.[11] In the end, the settlement acts extinguished the Tribes' claims to nearly two-thirds of the land area of the state and "achieved a certain sharing of authority with [the Tribes]." *Accord Akins,* 130 F.3d at 484; 25 U.S.C.A. § 1730 (West 1983).

[¶ 31] The description of the state's authority and the delineation of the lines for shared authority was central to the settlement. In order to accommodate the state's resistance to the creation of a "nation within a nation," the model chosen for the sharing of authority between the individual tribes and the state was a municipal model. *See* 25 U.S.C.A. § 1721(b)(3) (West 1983); 30 M.R.S.A. § 6206(1). This model created a framework to which all involved could look for resolution of any lingering jurisdictional disputes. Because the state's relationship with its municipalities was understood by the framers of the settlement, the model provided a measure of certainty about future relations not otherwise existing. Moreover, because the state's authority over municipal matters was well established, those members of state government who had been resistant to a compromise were reassured by the language of the Maine Implementing Act establishing the state's authority to enforce its laws throughout the state. *See* 30 M.R.S.A. § 6204 (1996).

[¶ 32] Both parties understood the general ramifications of the adoption of the municipal model. As Attorney General Cohen put it, "Let there be no mistake .... This proposed Settlement does not create any nation within a nation." [12]

[¶ 33] This aspect of the settlement, however, was not without its opponents. Members of the Tribes who had voted against the agreement in tribal proceedings spoke in opposition to the loss of tribal jurisdiction at the hearing before the Joint Select Committee of the Maine Legislature on Indian Land Claims. *See* Memorandum from the Indian Law Resource Center (Mar. 13, 1980) *in* 2 MAINE JOINT SELECT COMMITTEE ON INDIAN LAND CLAIMS, BACKGROUND INFORMATION ON INDIAN LAND CLAIMS (1980) (on file with the University of Maine School of Law library) (opposing the passage of the Implementing Act because the passage of that Act would "virtually terminate the sovereignty of the [Tribes]").

[¶ 34] Nonetheless, on behalf of the Tribes, Thomas Tureen, their attorney, acknowledged the significance of the settlement's jurisdictional compromise. After noting that the Tribes had in recent years been "uniformly successful" in repelling state jurisdiction in many matters relating to Indians, he noted, "In light of all this, one might ask why the Indians were willing to even discuss the question of jurisdiction with the State but simply the answer is that they were obliged to do so if they wanted to effectuate the Settlement of the

---

11. In designating the state as the political entity authorized to regulate the Tribes, the Settlement Act also made certain subsequently enacted federal statutes inapplicable to the Tribes, absent explicit reference to the Maine Tribes. 25 U.S.C.A. § 1735(b) (West 1983); *see also Passamaquoddy Tribe v. State of Maine,* 75 F.3d 784, 787 (1st Cir.1996).

12. Testimony of Maine Attorney General Richard S. Cohen, Public Hearing regarding the Maine Indian Claims Settlement (Mar. 28, 1980) *in* 1 MAINE JOINT SELECT COMMITTEE ON INDIAN LAND CLAIMS, BACKGROUND INFORMATION ON INDIAN LAND CLAIMS (1980) (on file with the University of Maine School of Law library).

monetary and land aspects of the claim which they had already worked out with the Carter Administration."[13]

■ [¶ 35] Thus, one of the most significant aspects of the settlement agreement was the Tribes' acquiescence in the assertion of the state's jurisdiction over the Tribes. Because tribal sovereignty exists at the sufferance of Congress, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), that acquiescence could not be enacted into Maine law without Congressional approval.[14] The necessary Congressional approval is set out in no uncertain terms in the Settlement Act:

> The Passamaquoddy Tribe, the Penobscot Nation, and their members ... shall be subject to the jurisdiction of the State of Maine to the extent and in the manner provided in the Maine Implementing Act and that Act is hereby approved, ratified, and confirmed.

25 U.S.C.A. § 1725(b)(1) (West 1983). The Maine Implementing Act in turn limits tribal authority such that the Tribes shall be subject to "all the duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State." 30 M.R.S.A. § 6206(1).[15]

[¶ 36] In the end, the compromises expressed in the settlement acts established substantial limitations on the sovereignty of Maine's Indian Tribes. The settlement acts, taken together, memorialized the Tribes' agreement to that result and gave Congress's imprimatur to a future in which the Tribes gained clarity of their official status in the eyes of the federal government, while at the same time, the state obtained clarity of its jurisdiction over the Tribes, thus significantly limiting the Tribes' sovereignty in their interactions with the State of Maine.

[¶ 37] The analysis cannot end there, however, because the settlement acts did not simply transform the Tribes into municipalities for all purposes. Rather, the Acts framed jurisdictional issues around a municipal model. That model contained several exceptions, creating distinctions from ordinary municipal law. The Acts also precluded the state's exercise of jurisdiction in certain limited but important areas. Those exceptions and limitations on the state's authority are critical to our analysis.

## B. The Parameters of the Municipal Model

■ [¶ 38] Because the Tribes agreed to be treated as municipalities for purposes of defining their relationship with the State of Maine, state laws that apply to municipalities also routinely apply to the Tribes. For example, similar to any municipality, the Tribes do not have absolute sovereign immunity against law suits. *See* 25 U.S.C.A. § 1725(d)(1) (West 1983). As with other cities and towns, however, the

---

13. Testimony of Thomas Tureen, Public Hearing regarding the Maine Indian Claims Settlement (Mar. 28, 1980) *in* 1 MAINE JOINT SELECT COMMITTEE ON INDIAN LAND CLAIMS, BACKGROUND INFORMATION ON INDIAN LAND CLAIMS (1980) (on file with the University of Maine School of Law library).

14. Tribal sovereignty is not merely subject to the control of Congress; it is subject to "complete defeasance" by federal legislation. *Wheeler*, 435 U.S. at 323, 98 S.Ct. 1079.

15. More broadly, the Maine Implementing Act states as a general rule that "[e]xcept as otherwise provided in this Act, all Indians, Indian nations, and tribes ... shall be subject to the laws of the State ... to the same extent as any other person." 30 M.R.S.A. § 6204 (1996). The "laws of the State" is defined as "the Constitution and all statutes, rules or regulations and the common law of the State and its political subdivisions." *Id.* § 6203(4) (1996).

Tribes are entitled to qualified immunity from suits in state and federal courts. *See* 30 M.R.S.A. § 6206(2) (establishing a Tribe's qualified immunity when "acting in its governmental capacity to the same extent as any municipality"); *Couturier v. Penobscot Indian Nation*, 544 A.2d 306, 307 (Me.1988). The Implementing Act provided the Tribes broad ordinance powers pursuant to a municipality's home rule authority. *See* 30 M.R.S.A. § 6206(1). Properties used by Tribes for "governmental purposes" are exempt from taxation by the state to the same extent provided for any such properties owned by municipalities. *Id.* § 6208(2) (1996). Regarding financial aid, not only are the Tribes "eligible to receive all of the financial benefits which the United States provides to Indians," 25 U.S.C.A. § 1725(i) (West 1983 & Supp.2000), but they are also eligible to receive financial assistance from the state as a municipality of the state, 30 M.R.S.A. § 6211(1) (1996).

[¶ 39] At the same time, however, exceptions to the municipal model were clearly anticipated by both parties. Some exceptions are set out without ambiguity. For example, in contrast to municipalities, the Tribes have retained exclusive jurisdiction over certain juvenile, civil, criminal, and domestic relations matters. 30 M.R.S.A. §§ 6209–A, 6209–B (1996 & Supp.2000); 25 U.S.C.A. § 1727 (West 1983) (granting tribal courts exclusive jurisdiction over Indian child custody proceedings pursuant to Indian Child Welfare Act of 1978). Judgments from those proceedings are granted full faith and credit, 25 U.S.C.A. § 1725(g) (West 1983), and are not subject to principles of double jeopardy in state courts. *See State v. Mitchell*, 1998 ME 128, ¶ 6, 712 A.2d 1033, 1034. The Tribes have the exclusive power to regulate certain aspects of the fishing and wildlife resources within their territories, 30 M.R.S.A. § 6207(1) (1996), a power not delegated to municipal-

ities. The Tribes also have the power to create tribal school committees, distinct from the committees established by the laws of Maine, 30 M.R.S.A. § 6214 (1996), but regulated in a similar fashion.

[¶ 40] Other exceptions to the municipal model recognize that the Tribes may take on roles that are distinct from municipal or governmental roles. In courts, the Tribes may generally sue and be sued to the same extent as "any other entity or person." 30 M.R.S.A. § 6206(2). When a Tribe acts in its business capacity, rather than in its governmental capacity, it is deemed to be a "business corporation organized under the laws of the State." *Id.* § 6208(3) (1996). When acting in its "business capacity as distinguished from its governmental capacity," a Tribe is taxed to the same extent as any other corporation. *Id.*; *cf. Couturier*, 544 A.2d at 309 n. 6 (explaining that the Maine Tort Claims Act, which ordinarily applies to municipalities, does not apply to the Tribes when acting in their business capacities). With regard to the federal government, the Tribes are recognized as sovereign "Indian tribes" entitled to receive federal funding available to other such tribes, but not subject to the full measure of control Congress has generally exercised over similar Indian tribes. *See* 25 U.S.C.A. § 1725; *cf. Akins*, 130 F.3d at 489–90; *Passamaquoddy Tribe*, 75 F.3d at 794.

■ [¶ 41] Thus, depending on the circumstances and activity engaged in by a Tribe, it may be recognized as a sovereign nation, a person or other entity, a business corporation, or a municipal government. *See, e.g.,* 19–A M.R.S.A. § 2802(19) (1998 & Supp.2000) (defining a Tribe as a sovereign "state" for purposes of the Uniform Interstate Family Support Act); 17 M.R.S.A. § 314–A (Supp.2000) (granting the Tribes the right to obtain licenses to

operate high-stakes beano). Designation of the capacity in which the Tribes act is, therefore, a necessary first step in the determination of the laws applicable to those actions.

[¶ 42] Accordingly, when it is asserted that a state law is applicable to the Tribes, our analysis proceeds as follows: (1) to what entities does the statute at issue apply; (2) are the Tribes acting in the capacity of such entities; (3) if so, does the Maine Implementing Act expressly prohibit the application of the statute to the Tribes generally; (4) if not, does the Maine Implementing Act prohibit or limit the application of the statute in the circumstances before the court. Here, the paper companies have asserted that the Freedom of Access Act is fully applicable to the Tribes. We turn then to our first enquiry: to what entities does the Freedom of Access apply.

## C. The Maine Freedom of Access Act

[¶ 43] By enacting the Freedom of Access Act, the Legislature has declared that "public proceedings exist to aid in the conduct of the people's business. It is the intent of the Legislature that their actions be taken openly and that the records of their actions be open to public inspection and their deliberations be conducted openly." 1 M.R.S.A. § 401 (1989). The provisions of the Act apply to all "public proceedings." *Id.* Public proceedings are defined for purposes of our analysis as "the transactions of any functions affecting any or all citizens of the State by ... [a] municipality." *Id.* § 402(2)(C) (1989 & Supp.2000). The Freedom of Ac-

cess Act does not create any exceptions to the application of the Act to the Tribes.

[¶ 44] Preliminarily, therefore, we must determine whether the Tribes are acting in their municipal capacities in the matter before us. We conclude that they are. The information sought by the paper companies relates to the Tribes' interactions, or "transaction[s]," with the federal government regarding the regulation of water quality within or adjacent to their territories. *See id.* § 402(3). Through their communications with the federal government, the Tribes have sought, inter alia, an approval to be treated like a "state," thus excluding the State of Maine from exercising authority over those portions of the rivers that are within or adjacent to their lands. *See* 33 U.S.C.A. § 1377(e). They do so not as businesses or individuals, but in their capacities as the governments of Indian territories in Maine. *Cf. Indian Township Passamaquoddy Reservation Hous. Auth.,* 495 A.2d at 1191–92. In doing so, the Tribes are unquestionably acting in their governmental capacities. The Maine Implementing Act defines their governmental status with regard to the State of Maine as a municipality. 30 M.R.S.A. § 6206(1).[16] The Tribes are therefore subject, in this context, to state laws affecting municipal governments. *See Couturier,* 544 A.2d at 308 (holding that the Maine Tort Claims Act, from which municipalities derive their immunity, applies to the Tribes when acting in their governmental capacity).

[¶ 45] Because the Freedom of Access Act applies to municipal governments and because the Tribes are acting in their municipal capacity, we must next determine

---

**16.** Consistent with this relationship, in the past, the Tribes have applied to the State of Maine Department of Environmental Protection, Bureau of Water Quality Control, as *municipalities* to obtain Waste Discharge Li-

censes. *See, e.g.,* Municipal Application from Jerry Pardilla, Governor of Penobscot Nation, to State of Maine Department of Environmental Protection (Jan. 29, 1993).

whether any provision of the Maine Implementing Act prohibits or limits the application of the Freedom of Access Act to the Tribes generally or as applied to this case.

[¶ 46] The Tribes argue that the internal tribal matters exception flatly prohibits any application of the Freedom of Access Act to the Tribes. *See* 30 M.R.S.A. § 6206(1). Specifically, the Tribes assert that because the Act would regulate "tribal government," its application is prohibited by the exception for "internal tribal matters," defined to include tribal government. *See id.* There is no question that the state may not interfere with internal tribal matters. *Id.* The question is whether the application of the Freedom of Access Act would always interfere with internal tribal matters.

[¶ 47] Generally, the Act affects two areas of government action. First, it requires that public proceedings be open to the public. 1 M.R.S.A. § 403 (1989). Second, it requires that the public be given access to all public records. *Id.* § 408 (1989).[17] The paper companies have sought access not only to documents generated by the Tribes as a result of the decisions or actions of tribal government, but also to the minutes of the Tribes' meetings or hearings. *See id.* §§ 402, 403. Thus, both aspects of the Act are implicated here.

[¶ 48] Whether either aspect of the Freedom of Access Act would reach into internal tribal matters requires an understanding of that term. *Fellencer*, 164 F.3d at 709. "Internal tribal matters" is not defined in the Implementing Act, but includes "membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, *tribal government,* tribal elections and the use or disposition of settlement fund income." 30 M.R.S.A. § 6206(1) (emphasis added). The Committee Report accompanying the bill "To Provide for the Settlement of Land Claims of Indians, Indian Nations and Tribes and Bands of Indians in the State of Maine" described this aspect of the compromise as follows:

> Prior to the settlement, the State passed laws governing the internal affairs of the Passamaquoddy Tribe and the Penobscot Nation, and claimed the power to change these laws or even terminate these tribes.... While the settlement represents a compromise in which state authority is extended over Indian territory to the extent provided in the Maine Implementing Act ... the settlement provides that henceforth the Tribes will be free from state interference in the exercise of their internal affairs.

H.R. Rep. No. 96–1353 (1980), 1980 U.S.Code Cong. & Admin.News p. 3790; *cf.* 22 M.R.S.A. §§ 4701–4836 (dictating the rules and regulations that apply to the Tribes) (repealed in substantial part by Maine Implementing Act, P.L.1979, ch. 732).

[¶ 49] Because the Implementing Act does not define internal tribal matters, giving definition to the term has necessarily fallen to the courts. It has proven to be a complex task. The First Circuit in *Akins* has suggested several factors for consideration in determining whether a disputed issue relates to an "internal tribal matter." *Akins*, 130 F.3d at 486–87. While these factors are neither exclusive

---

**17.** "Public record" is defined as (1) "any written, printed or graphic matter ... from which information can be obtained," (2) "that is in the possession or custody of an agency or public official of this State or any of its political subdivisions," and (3) "has been received or prepared for use in connection with the transaction of public or governmental business or contains information relating to the transaction of public or governmental business[.]" 1 M.R.S.A. § 402(3) (1989 & Supp. 2000).

nor dispositive, they provide a common sense framework for addressing this murky area, referred to by the *Akins* court as "treacherous," in which the state's authority over the Tribes may be curtailed. *Id.* at 487. Those factors include: (1) the effect on nontribal members, (2) & (3) the subject matter of the dispute, particularly when related to Indian lands or the harvesting of natural resources on Indian lands, (4) the interests of the State of Maine, and (5) prior legal understandings. *Id.* at 486–87.

[¶ 50] Applying the *Akins* factors, we conclude that a Tribe's own methods of convening and engaging in government will in most instances be matters "internal" to the Tribe. *See id.* at 487–88, 490 (concluding that the regulation of stumpage permits was an "internal tribal matter" where policy only dealt with tribal members and natural resources within tribal territories). The methods by which the Tribes govern themselves are not matters of interest to the citizenry of the state at large. Tribal government will ordinarily be focused on Indian territory, tribal resources, and members of the Tribe. Moreover, treating the processes of tribal government as free from state interference is entirely consistent with the intent of the settlement acts. *See id.* at 488–89; *see also* 30 M.R.S.A. § 6206(1); *Fellencer,* 164 F.3d at 709–10, 713.

[¶ 51] We need not determine the full parameters of the instances where the Act will not apply to the Tribes. It will suffice to conclude that the Freedom of Access Act is not ordinarily applicable to the methods and actions by which the Tribes engage in self governance.[18] This

conclusion is consistent with the House and Senate committee reports which indicated Congress's understanding that, pursuant to the internal tribal matters exception, the Tribes "may exclude non-Indians from tribal decision-making processes." S. REP. No. 96–957, at 15 (1980); H.R. REP. No. 96–1353 (1980), 1980 U.S.Code Cong. & Admin.News p. 3791.

[¶ 52] Thus, when the Tribes undertake the deliberative processes of self-governance, they are, in most instances, engaged in matters that are "internal tribal matters." *See Stilphen,* 461 A.2d at 489–90. The application of the Freedom of Access Act to such internal tribal affairs would constitute an impermissible imposition of state laws on the Tribes' exclusive right to regulate their "tribal government." 30 M.R.S.A. § 6206(1).

[¶ 53] In the context of this case, the Tribes' internal discussions, votes, and decision-making as to whether they would petition the federal government, and if so, in what manner and to what extent, are processes entirely internal to the Tribes. Neither the state nor the general public has a right to be involved in, or sit in on, that internal decision-making process. Similarly, the methods used to reach the decisions, along with the documents generated in the process, were within the Tribes' authority to create, without interference from the state or the public.

[¶ 54] It is not until the decisions made in the course of tribal governance find their way to actions and interactions with others outside of the Tribes that the Tribes will ordinarily be deemed to have moved outside of internal tribal matters.[19].

---

18. The Freedom of Access Act would also not apply to the Tribes in instances where they are acting in their corporate or other nongovernmental capacities.

19. Not all actions affecting non-Indians fall outside the definition of internal tribal matters. *See, e.g., Penobscot Nation v. Fellencer,* 164 F.3d 706, 710 (1st Cir.1999) (holding that "the decision to terminate Fellencer as the

*Cf. id.* § 6210(3) (1996). When the Tribes, in their municipal capacities, act or interact with persons or entities other than their tribal membership, such as the state or federal government, the Tribes may be engaged in matters that are not "internal tribal matters." *See Stilphen,* 461 A.2d at 488–90.

[¶ 55] We conclude that the effort of the Tribes to obtain a position on a par with state government regarding the regulation of water quality is such an instance. The Maine Implementing Act makes state laws regarding natural resources generally applicable to tribal lands. 30 M.R.S.A. § 6204. The Tribes' efforts would, in many aspects, have a direct effect upon members of the public outside the borders of tribal lands and upon the Tribes' relationships with the state, *see* 33 U.S.C.A. 1377(e), could limit the state's authority, and could affect the state's relationship with federal agencies. The relationship between the state and the Tribes regarding the regulation of water quality within the state is a matter of the legitimate interest of the citizens of this state. Thus, the Tribes' communications with the federal government or the state in the context of their water quality authority are not matters "internal" to the Tribes, and are subject to the public records provisions of the Freedom of Access Act. *See* 1 M.R.S.A. § 402(3).[20]

[¶ 56] In sum, because the decisions reached by the Tribes have resulted in actions of a governmental nature that may have a meaningful effect on members of the public who are not members of the Tribes, the provisions of the Freedom of Access Act apply to those actions. *See Stilphen,* 461 A.2d at 480, 490 (holding that operation of beano games, open to the general public and drawing "hundreds of players [to the Tribe] from all over Maine and beyond," was not an internal tribal matter). Thus, when the Tribes communicate with the state or federal government, file documents relating to the dispute of authority at issue, and provide the other governments with information regarding their requests, they are not engaged in "internal tribal matters." *See* 30 M.R.S.A. § 6206(1).

[¶ 57] The paper companies, however, have not limited their document requests to the Tribes' communications with other governmental entities. They also seek minutes of tribal council meetings in which any discussion of options or proposals regarding governance of water quality occurred. As we concluded above, although the Tribes' interactions with the state and federal government in this instance do not fall within the exception for internal tribal matters, the council meetings and internal decision-making processes of the Tribes do. *See id.*

### III. CONCLUSION

[¶ 58] With the enactment of the Act to Implement the Maine Indian Claims

---

community health nurse [which] affects many tribal members but only one non-tribal member" was an internal tribal matter).

20. The Tribes do not contend that the documents that they have submitted to the federal government would not be available from the federal government pursuant to the federal Freedom of Information Act. *See Dep't of the Interior v. Klamath Water Users Protective Ass'n,* —— U.S. ——, 121 S.Ct. 1060, 1063,

1069–70, 149 L.Ed.2d 87 (2001) (holding that the documents passed between Indian tribes and the Department of the Interior, which addressed "tribal interests subject to state and federal proceedings to determine water allocations," were available from the Department pursuant to the federal Freedom of Information Act and were not exempt as intra-agency memorandum or letters). *See also Wiggins v. McDevitt,* 473 A.2d 420 (Me.1984).

Settlement and the ratification of that Act by Congress, Maine's Indian Tribes agreed to significant limitations on their sovereignty, and agreed to be treated within the State of Maine, not as separate sovereigns, but, generally, as municipalities subject to the laws of Maine. The Tribes accepted those limitations in exchange for assets totalling approximately $81.5 million.

[¶ 59] The Freedom of Access Act applies to all of Maine's municipalities. When the Tribes act in their municipal capacity, they are subject to Maine's laws applicable to municipal governments. No explicit exception to the Act's application to the Tribes is found in the settlement acts or the Freedom of Access Act itself.

[¶ 60] The Tribes are distinct from municipalities, however, in that when they are engaged in internal tribal matters, state laws cannot be imposed on them. Tribes are ordinarily acting with regard to internal tribal matters when they are engaged in the deliberative processes of self-government. They are not engaged in internal tribal matters when they interact with federal and state governments in efforts to expand or clarify their authority within the framework of the state's competing authority. Thus, in the context of the matter before us, the Freedom of Access Act does not apply to the Tribes in the internal conduct of their governments, but does apply when the Tribes communicate and interact with other governments.

[¶ 61] Accordingly, the Superior Court did not err in requiring the Tribes to turn over copies of their correspondence or documents exchanged with the state or federal government that relate to their efforts to obtain federal recognition as a "state" in water quality matters. We therefore affirm the court's judgment requiring the Tribes to turn over the following: any communications and documents provided to the state or federal government, or documents received from the state or federal government related to:

1. efforts by the Tribes to obtain "treatment as a State" status pursuant to section 518 of the Clean Water Act, 33 U.S.C. § 1377(e);

2. efforts by the Tribes to have the U.S. Environmental Protection Agency adopt water quality standards different from those of the State of Maine for any waters located in the State of Maine; and

3. any agreements with federal government agencies that relate to the protection or study of water or other natural resources.

[¶ 62] Because the Freedom of Access Act does not apply to the Tribes' internal governmental proceedings, we vacate the judgment to the extent that it required the Tribes to turn over (1) notices of or agenda from any tribal council meetings; (2) notes taken at any tribal council meetings; or (3) minutes of any tribal council meetings.

[¶ 63] To the extent that any documents sought by the paper companies have not been identified here, the court is authorized on remand to enter any judgment necessary to clarify the Tribes' responsibility under the Freedom of Access Act, consistent with this opinion.

[¶ 64] Because we have altered the class of documents which are required to be turned over by the Tribes, we vacate the judgment of contempt against the Tribes and remand the matter to the Superior Court with instructions to allow the Tribes a reasonable period of time to voluntarily comply with the court's restructured order.[21]

The entry is:

---

21. In declaring unsettled questions of law, we

frequently decline as a matter of comity to

The Superior Court's judgment, denying the Tribes' motion to dismiss and granting the paper companies' motion for summary judgment, is affirmed in part and vacated in part. The judgment of contempt is vacated. Remanded for further proceedings consistent with this opinion.

summarily enjoin a coordinate branch of government. *See, e.g., Littlefield v. Town of Lyman,* 447 A.2d 1231, 1235 (Me.1982). We operate on the assumption that responsible governmental officials will comply with the law once it is declared. It is appropriate for the courts of Maine to extend this same degree of deference and respect to the representatives of the Penobscot Nation and the Passamaquoddy Tribe.