2006 ME 53

**WINIFRED B. FRENCH CORP. et al.**

v.

**PLEASANT POINT PASSAMAQUODDY RESERVATION.**

Supreme Judicial Court of Maine.

Argued: April 12, 2006.
Decided: May 8, 2006.

Bernard J. Kubetz, Esq. (orally), F. David Walker IV, Esq., Eaton Peabody, Bangor, Jeffrey J. Pyle, (pro hac vice) (orally), Prince, Lobel, Glovsky & Tye, LLP, Boston, MA, for the plaintiff.

Craig E. Francis, Esq. (orally), Jensen, Baird, Gardner & Henry, Portland, for the defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, LEVY, and SILVER, JJ.

SAUFLEY, C.J.

[¶ 1] Winifred B. French Corporation, doing business as *The Quoddy Tides,* and Bangor Publishing Company, publisher of the *Bangor Daily News* (the newspapers), appeal from a judgment of the Superior Court (Washington County, *Humphrey, C.J.*) in favor of the Pleasant Point Passamaquoddy Reservation. The newspapers brought this action under the Freedom of Access Act (FOAA), 1 M.R.S. §§ 401–410 (2005), seeking Reservation documents concerning a proposed liquefied natural gas (LNG) facility as well as a declaratory judgment that meetings of the Reservation's governor and council must be open to the public. We affirm the judgment.

## I.  BACKGROUND

[¶ 2] The parties stipulated to most of the relevant facts. The Reservation is located at Pleasant Point on Passamaquoddy Bay, near Eastport in Washington County. The Reservation is a political subdivision of the Passamaquoddy Tribe and is governed by an elected governor and council. From May 2004 onward, the governor and council engaged in negotiations with Quoddy Bay, LLC, an Oklahoma company, concerning a proposed lease of Reservation land on which Quoddy Bay proposes to build an LNG import facility. A lease was signed in May 2005 and approved by the U.S. Secretary of the Interior in June.

[¶ 3] Between May 2004 and May 2005, the governor and council held meetings to discuss the proposed lease, at which attendance was limited to members of the Tribe and non-member invitees. A *Quoddy Tides* reporter was refused admittance to one meeting in May 2005. In July 2005, the governor denied written requests by

the *Tides* and the *Bangor Daily News* for Reservation records relating to the LNG project and a written request by the *Tides* that its reporters be allowed to attend meetings. The Reservation did not respond to written requests of both newspapers made in August 2005 for records relating to the proposed LNG facility and to any communications by the Tribe with Quoddy Bay.

[¶ 4] Additional undisputed facts came out through hearing testimony and exhibits. The proposed LNG facility caused considerable controversy in the surrounding area, including both expectations of economic benefits and concerns about possible effects on safety, navigation, tourism, property values, fisheries, and the environment. Members of the Tribe living at or near the Reservation approved the governor and council's negotiations with Quoddy Bay in a referendum in August 2004.

[¶ 5] The original proposal was to build the LNG facility on annexed Reservation land at Gleason's Cove in the Town of Perry. Commercial development of that land requires approval of the Town's voters, 30 M.R.S. § 6203(5) (2005), and they voted against the proposal at a referendum in March 2005. The lease between the Reservation and Quoddy Bay signed in May 2005 was for a different parcel, called Split Rock, on the original 100 acres of the Reservation at Pleasant Point. The lease itself was based on a proposed LNG lease between ConocoPhillips and the Town of Harpswell that was rejected by Harpswell voters in March 2004. The terms of the lease include a provision reserving to the Reservation its right to separately exercise any of its governmental functions, as well as extensive covenants relating to the impact of the LNG project.

[¶ 6] The newspapers filed a complaint against the Tribe in Superior Court in September 2005, seeking disclosure of the documents they had requested in August 2005 and access to meetings of the governor and council. The court held a hearing in November at which, on joint motion of the parties, the court substituted the Reservation for the Tribe as the defendant. In January 2006, the court entered judgment (1) for the Reservation on the newspapers' FOAA claim seeking the records requested in their August letters, and (2) declaring that meetings of the Reservation and its council relating to the LNG project are not public proceedings that must be open to the public under FOAA. The newspapers then brought this appeal.

## II. DISCUSSION

[¶ 7] The Act to Implement the Maine Indian Claims Settlement, 30 M.R.S. §§ 6201–6214 (2005) (the Maine Implementing Act), approved by the federal Maine Indian Claims Settlement Act of 1980, 25 U.S.C.A. §§ 1721–1735 (West 2001 & Supp.2005) (the Settlement Act), sets forth the authority of the Passamaquoddy Tribe and the Penobscot Nation according to "a municipal model" under which, for many purposes, those tribes are treated as municipalities. *Great Northern Paper, Inc. v. Penobscot Nation,* 2001 ME 68, ¶¶ 31–37, 770 A.2d 574, 584–85.[1] Thus, 30 M.R.S. § 6206(1) provides that the tribes are "subject to all the duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State." There are exceptions to the municipal model, however, and the tribes do

---

1. In *Great Northern Paper, Inc. v. Penobscot Nation,* 2001 ME 68, 770 A.2d 574, we addressed the application of FOAA to the Penobscot Nation and the Passamaquoddy Tribe.

We reviewed in detail the history of the Maine Implementing Act and the federal Settlement Act. *See id.* ¶¶ 18–37, 770 A.2d at 581–85.

not always act in a municipal capacity: "[D]epending on the circumstances and activity engaged in by a Tribe, it may be recognized as a sovereign nation, a person or other entity, a business corporation, or a municipal government." *Great Northern*, 2001 ME 68, ¶ 41, 770 A.2d at 586.

[¶ 8] In *Great Northern*, we set out a general framework for deciding whether a state law applies to Indian tribes. We ask four questions:

> (1) to what entities does the statute at issue apply; (2) are the Tribes acting in the capacity of such entities; (3) if so, does the Maine Implementing Act expressly prohibit the application of the statute to the Tribes generally; (4) if not, does the Maine Implementing Act prohibit or limit the application of the statute in the circumstances before the court.

*Id.* 42, 770 A.2d at 587.

[¶ 9] In this case the answer to the first question is clear. FOAA applies to "public records" and "public proceedings," including those of municipalities. 1 M.R.S. §§ 401, 402(2)(C), (3); *Dow v. Caribou Chamber of Commerce & Indus.*, 2005 ME 113, ¶ 10, 884 A.2d 667, 670. The general rule under FOAA is that a municipality's documents are public records, and its meetings are public proceedings, so that its documents are subject to public inspection and copying and its meetings must be open to the public. 1 M.R.S. §§ 402(2)(C), (3), 403, 408; *Great Northern*, 2001 ME 68, ¶ 47, 770 A.2d at 588.

[¶ 10] In deciding whether FOAA applies to a particular activity of an Indian tribe,[2] then, we next ask whether the tribe is acting in its municipal capacity. *See Great Northern*, 2001 ME 68, ¶ 44, 770 A.2d at 587. The trial court held that the Reservation was not acting in its municipal capacity when it negotiated and entered into the lease with Quoddy Bay.[3] In a cogent opinion, the court concluded that "the Reservation acts in a governmental capacity when it regulates its land, but acts in a business capacity when it merely leases the land."

[¶ 11] To determine in what capacity a tribe has acted, we examine "the circumstances and activity engaged in" by

---

**2.** By its terms, our holding in *Great Northern* applies only to the Penobscot Nation and the Passamaquoddy Tribe, because of their unique status under the Maine Implementing Act and the Settlement Act. *See* 2001 ME 68, ¶ 1, 770 A.2d at 577. Here the parties and the trial court appear to have assumed that the Pleasant Point Passamaquoddy Reservation should be treated the same as the Passamaquoddy Tribe for purposes of applying *Great Northern*, and we agree that this is the correct approach. The Reservation's status as a political subdivision of the Tribe, governed by its own council, is recognized in the Maine Implementing Act: " 'Passamaquoddy Tribe' means the Passamaquoddy Indian Tribe as constituted on March 4, 1789, and all its predecessors and successors in interest, which, as of the date of passage of this Act, are represented by the Joint Tribal Council of the Passamaquoddy Tribe, with separate councils at the Indian Township and Pleasant Point Reservations." 30 M.R.S. § 6203(7) (2005). The Reservation, as a branch of the Tribe, has the same status as the Tribe for purposes of applying *Great Northern;* there is no reason that FOAA should apply to the Reservation to any greater or lesser extent than it applies to the Tribe. *Cf. Francis v. Pleasant Point Passamaquoddy Housing Auth.*, 1999 ME 164, ¶ 8, 740 A.2d 575, 577–78 (holding that because tribal housing authority is creature of statute, not branch of tribal government, it cannot invoke internal tribal matters exception).

**3.** The court actually held that the Reservation was acting in its municipal capacity with regard to a promise of a tax break contained in the lease, but that this action was exempt from FOAA under the internal tribal matters exception, 30 M.R.S. § 6206(1) (2005). The newspapers do not challenge this determination on appeal.

the tribe. *Id.* ¶ 41, 770 A.2d at 586. We will first ask whether the tribal actions included any of the core indicia of governing, such as taxation, regulation or permitting, and lawmaking or law enforcement. None of these are present in this case (except a taxation provision that is not at issue on appeal). Contrary to the newspapers' argument, the covenants in the lease regarding environmental and related impacts do not reflect municipal regulation, but set forth the contractual obligations of the parties to the lease. They are the sort of restrictions or conditions that could be insisted on by any commercial/industrial landlord, especially one that wants to maintain good relations with the surrounding communities and a safe environment for the many people (including tribal members) who live in close proximity to the lease site.

■ [¶ 12] The newspapers raise another issue about regulation by challenging the trial court's conclusion that any attempted regulation of the LNG facility by the Reservation in its municipal capacity would be preempted by federal law. Although we recognize that the federal government is the primary regulator for the proposed LNG facility, we need not decide whether the Reservation, acting as a local government, could also take on a regulatory role. Even if the Reservation could regulate the facility, it did not do so merely by negotiating and entering into the lease with Quoddy Bay.

■ [¶ 13] In addition to the core indicia of government, we will also look for activities that, depending on the circumstances, could indicate municipal governance. The newspapers point to the referendum held by the Reservation's governor and council that endorsed their negotiations with Quoddy Bay. Elections, including referenda, are indeed often characteristic of municipal government, but that is not always the case. Non-governmental organizations govern themselves through votes of their members in some situations. For example, as the Reservation points out, business corporations often hold shareholder votes. In the circumstances of this case, where the referendum apparently was non-binding, limited to Tribe members who lived on the Reservation or in surrounding areas, and concerned the endorsement of business negotiations for a commercial lease, we cannot say that the referendum demonstrates that the Reservation was acting in its municipal capacity.

■■ [¶ 14] There are also factors that we think are of little or no importance in determining in what capacity a tribe has acted. One of these is the degree of public interest or controversy generated by the tribal action. A tribe's actions in a non-governmental capacity cannot be rendered governmental merely by resulting controversy. Nor can the potential effect that a tribal activity may have on persons outside the tribe be dispositive of the municipal-capacity question, although it is relevant to whether the activity at issue is an "internal tribal matter." *See Great Northern,* 2001 ME 68, ¶ 49, 770 A.2d at 589 (citing *Akins v. Penobscot Nation,* 130 F.3d 482, 486–87 (1st Cir.1997)).

■ [¶ 15] Examining all the relevant factors, then, we agree with the trial court that the Reservation's conduct in entering as landlord into a commercial lease for up to $16 million per year in rent is more like the profit-making activity of a business corporation than the governmental activity of a municipality. The fact that a municipality like the Town of Harpswell could have entered into a similar lease, and would have been subject to FOAA in doing so, cannot be determinative because Harpswell is a municipality at all times and for all purposes, while the Reservation is not.

[¶ 16] Nor, finally, does public policy require subjecting the Reservation to FOAA in this matter. The LNG facility would affect the public interest, but only to the same degree that it would if the Reservation were a private landowner. FOAA's policy of open government, *see* 1 M.R.S. § 401; *Town of Burlington v. Hosp. Admin. Dist. No. 1*, 2001 ME 59, ¶ 13, 769 A.2d 857, 861, would demand free access if a town were the owner leasing land for an LNG facility, but under the delicate balance of interests embodied in the Settlement Act and Maine Implementing Act, the tribes have more autonomy than towns in many respects, *see Great Northern*, 2001 ME 68, ¶¶ 37, 39–41, 770 A.2d at 585–87. Although the newspapers' desire to promote public access to information on issues of public concern is commendable, their free access rights under FOAA are generally limited to "the transaction of public or governmental business," 1 M.R.S. § 402(3), and do not reach private transactions such as the lease between the Reservation and Quoddy Bay. *See generally Dow*, 2005 ME 113, ¶¶ 12–18, 884 A.2d at 670–72.

[¶ 17] In sum, because the Reservation was not acting in its municipal capacity, we agree with the trial court that FOAA does not apply. We do not reach the third and fourth steps of the *Great Northern* framework. In particular, we need not decide whether any of the Reservation's actions are within the Maine Implementing Act's "internal tribal matters" exception. *See* 30 M.R.S.A. § 6206(1). The trial court did not err in entering judgment for the Reservation on both counts of the newspapers' complaint.

The entry is:

Judgment affirmed.